262 S.W.2d 349 (1953)
THOMASON
v.
THOMASON.
No. 28640.
St. Louis Court of Appeals. Missouri.
November 17, 1953.
*350 E. L. McClintock, Jr., Flat River, for appellant.
J. Grant Frye, Cape Girardeau, for respondent.
WOLFE, Commissioner.
This is a suit for separate maintenance in which the plaintiff prevailed below and the defendant was directed to pay her sixty dollars a month. The defendant prosecutes this appeal.
The petition alleged that the plaintiff had been kept in a state of terror by defendant's threats of violence and fits of temper, so that it was impossible for her to live with him, and that she was obliged to leave their home with their daughter in March of 1948. She further alleged that since that time he failed to support her.
The answer denied the charges of the petition and alleged that the plaintiff abandoned the defendant when he was under treatment by a Dr. Hocter for a mental illness. It was further averred that the defendant contributed to the support of the plaintiff and the child since their departure.
Thomason, a dentist, married the plaintiff, who was a trained nurse, in 1936. They took up their residence in Flat River, Missouri, and lived in a house which they owned as tenants by the entirety. A daughter was born to them in 1937. Their trouble apparently started in 1947, when Thomason became ill and his condition was diagnosed as heart trouble by his physician who ordered him to bed for six weeks.
Mrs. Thomason testified that her husband was afraid and wanted some one with him at all times. According to her, he was given phenobarbital until he "began jumping from one illusion to another." It was later decided that he was suffering from a psychiatric disturbance and he was treated by a Dr. Mueller and later by Dr. Hocter, both of whom are psychiatrists. He was given shock treatments on four occasions and refused thereafter to take any more. Two incidents were related, which the plaintiff considered threats of violence. One arose out of a political argument which she said culminated when he "lunged" at her. She said: "I ran for the bathroom and Zenda Gale came running downstairs and I came out, but he didn't do anything." The other incident occurred in February of 1948. At that time the plaintiff had secured employment as a nurse and was about to go to work, when, according to her, the following conversation took place:
"He came out and he said: `Where is my gun?' I said, `Gale, you don't need your gun. Go to your office,' and he said, `Where is my gun?' I said, "Guy Roux has it,' and he said, `Looks to me like he would bring it back.' I said, `You don't need your gun.' He said, `You never can tell what a crazy man might do.' I said, I have to go to work."
This was construed by the plaintiff to be a threat. The gun in question was a shotgun that had been loaned to the party mentioned and was later purchased by him from the defendant.
The plaintiff also testified that he "hounded" their daughter. At one time when he was ill he held her hand and asked her to pray and she was frightened by him when he was sick. She stated, however, that he had never physically hurt the child.
In March of 1948 plaintiff left the defendant with her daughter and filed an action for separate maintenance, but in 1949 this action was dismissed and the defendant moved out of the family residence and turned it over to his wife and child. After they moved in he paid the water and light bills and sent his wife five dollars each week. He was not able to work much after *351 the separation and at the time of trial he was still unable to work full time at his profession. His net earnings for the five months preceding the trial amounted to $175 a month. Plaintiff earned about $38 a week as a trained nurse and had been so employed since the separation.
Two physicians who attended Thomason were called by him as witnesses. Dr. Appleberry, who first treated him for heart trouble, testified that the defendant was suffering from a mental illness in March of 1948, and that he was easily upset and would cry. A psychiatrist testified that Thomason was a very sick individual and needed constant supervision in that he was unpredictable in his behavior. He stated that he was not fully accountable for his acts. This witness further testified that he did not think the plaintiff's life was endangered by her husband's illness.
Mrs. Rigsbee, who was a sister of the defendant, testified that the plaintiff came to her house on the day that she left her husband; that she told Mrs. Rigsbee that she was leaving Thomason because she had a chance to go to work in a hospital in Bonne Terre, and concluded by saying,"You Thomasons will just have to take care of him". This witness also stated that the only complaint the plaintiff ever made of her married life was that Thomason did not give her as much money as other doctors" wives had.
The defendant testified that he never at any time threatened his wife. He inquired about his gun because he missed it and he had forgotten who had borrowed it. He said that he had sent several people to see the plaintiff after their separation in an effort to effect a reconciliation. One of these was the minister of the Presbyterian Church. The efforts of all of them were to no avail.
At Christmastime in 1950, he went with a friend of his to deliver presents to his wife and daughter. He had a box of candy for each and a house robe for his daughter. Neither he nor his friend were cordially received and after handing the presents to his daughter they left. As he was closing the front gate, Mrs. Thomason opened the door of the house and yelled at him to never set foot in the house again. His friend corroborated his testimony as to this incident.
At another time he made a present of a ukulele to his daughter and this evoked from his wife a letter which was in evidence and starts: "Cheap Cheap Cheap ScroogeHumbug If you can't buy a uke that will hold strings in tunewhy don't you let some one who knows how buy one* * * " It continues in the same tone to its conclusion. Another letter the plaintiff wrote to the defendant in June of 1952 starts by calling him "a liar, a cheat & a louse."
It is the contention of the defendant that the foregoing evidence was insufficient to support a decree of separate maintenance. The plaintiff conversely maintains that the evidence was sufficient to prove constructive abandonment and a failure on the part of the defendant to support her. There are two things that must be proven before a wife is entitled to a decree of separate maintenance. The first of these is that the defendant has abandoned her, and the second is that he has refused and neglected to provide for her. Section 452.130 RSMo 1949, V.A.M.S.; Remley v. Remley, Mo.App., 208 S.W.2d 807; Hoynes v. Hoynes, Mo.App., 218 S.W.2d 823; Herbig v. Herbig, Mo.App., 245 S.W.2d 455; Kendrick v. Kendrick, Mo.App., 251 S.W.2d 329.
As to the first requisite, we stated in Remley v. Remley, Mo.App., 208 S.W.2d 807, loc. cit. 814:
"Abandonment may be actual, as where there is a cessation without good cause from cohabitation, with the intention on the part of the deserter not to resume same, together with the absence of complainant's consent to such separation; or it may be established by proof of such indignities as to justify the wife in refusing to live with the husband."
*352 The indignities required to be proven to establish constructive abandonment were stated in Brady v. Brady, Mo.App., 71 S.W.2d 42, loc. cit. 47, wherein we said:
" * * * to state the matter simply and tersely, a wife in a proceeding for separate maintenance cannot prevail unless she proves facts such as would entitle her to a divorce if that was the relief she was seeking."
We are obliged to view the evidence in the light of these pronouncements and to determine if there were sufficient facts proven to have warranted a decree of divorce for the plaintiff if that had been the remedy she pursued. The indignities of which she complains arose while the defendant was very sick. They were acts of irritability that arose from his illness. She was a trained nurse and understood this, but because it made her own life disagreeable and hard to bear she chose to leave him. The acts that the defendant here committed were not indignities that give sanction to her departure. Marriage would indeed be a frail bond if the inconvenience caused by the sickness of one spouse gave a right of divorce to the other. But if there had been grievous indignities committed by the defendant throughout the time in question, the evidence clearly reveals, and the plaintiff knew, that he was not of sound mind at the time. The indignities that give rise to a cause of action for divorce must be intentionally committed. Here we have uncontroverted evidence that the defendant had no control of his emotions. He was easily disturbed and would weep. His behavior was unpredictable and he was not fully accountable for his acts. Acts committed by a person in that condition are not grounds for divorce. Fossett v. Fossett, Mo.App., 243 S.W.2d 625; Dunn v. Dunn, 240 Mo.App. 87, 216 S.W.2d 141; Crow v. Crow-Humphrey, 335 Mo. 636, 73 S.W.2d 807. Since the acts relied upon as indignities would not be sufficient to sustain a divorce, they fail also to prove constructive abandonment.
Even as to the second requirement in an action for separate maintenance (that is proof of a failure to provide), the evidence tends to show that Thomason was doing about all that could properly be expected of him considering his mental and physical condition.
The respondent contends that in passing upon this case we must defer to the trial court that had the witnesses before it. Where a question of credibility is the determining factor in a case, we defer to the judge who saw and heard the witnesses, which is an advantage that we do not enjoy. However, the decision of the present case does not rest upon the question of which party merits belief, for there is little or no dispute as to what took place, and under such circumstances we reach our own conclusions from the evidence. Rusche v. Rusche, Mo.App., 200 S.W.2d 577; Harviel v. Harviel, Mo.App., 247 S.W.2d 346; Pipkin v. Pipkin, Mo.App., 255 S.W.2d 66.
From the letters in evidence and the testimony of all the witnesses, including the plaintiff, it appears that the defendant was the aggrieved party, but he seeks no relief.
For the reasons stated, it is the recommendation of the Commissioner that the judgment be reversed.
PER CURIAM.
The foregoing opinion of WOLFE, C., is adopted as the opinion of the Court.
The judgment of the circuit court is accordingly reversed.
BENNICK, P. J., and ANDERSON, J., and ADAMS, Special Judge, concur.