Elza SELLARS, Plaintiff-Appellant,

v.

Tressie SELLARS, Defendant-Respondent.

No. 7291.

Springfield Court of Appeals.

Missouri.

Jan. 11, 1955.

James E. Curry, Ava, Rogers & Rogers, Gainesville, for plaintiff-appellant.

Bill Davenport, Ozark, B. H. Clampett and Walker & Daniel, Springfield, for defendant-respondent.

RUARK, Judge.

Plaintiff, appellant here, brought suit for divorce alleging general indignities composed of (a) defendant associated intimately with other men on various occasions and (b) after a discussion of the subject mentioned in (a) she did, on December 28, 1952, without warning, leave the home and thereafter remained away. Defendant filed answer with appropriate denials and crossbill alleging general indignities, that the plaintiff was quarrelsome, abusive and cruel to the extent of endangering her health, that he struck and beat her and by reason of mental cruelty and extreme physical abuse she was compelled to leave the home and seek refuge elsewhere.

The couple were married in 1939 and the fruits of their union were three children, whose approximate ages at trial date were thirteen, eleven and ten years. At the time of the marriage and for a short period thereafter defendant was teaching school and boarding at the home of a Mr. and Mrs. S. Thereafter they (plaintiff and defendant) lived on a farm about seven miles south of Mountain Grove.

Almost from the inception of the marriage plaintiff tortured himself and his wife with suspicions concerning her conduct with one S. He testified that trouble arose "right away after we was married, trouble that continued on up until we was separated. It was over S. * * * When she was boarding down there to his place, I noticed things that didn't look right. One time, I got a bunch of beggar lice on my pants-leg, and I got a knife to scrape them off with, and she kind of fussed a little about me raising a fuss over such a little thing, and he allowed if they was on her pants that she wouldn't like it either."

Shortly prior to the separation he learned that S. was within the vicinity quail hunting (about two and a half miles away). He went home and noticed there were some car tracks, or, to use his words, "a car jog out." near the gate at the front of his home and he went in and found the family washing had not been completed. From this he formed suspicion of an improper visit from S. His wife told him that S. had not been there and they had an argument about it. There was no evidence whatsoever to show that S. had been there, and there was other evidence to show his whereabouts elsewhere, but plaintiff jumped to the conclusion that he had been. That evening he went to see S. about it and lied to him about what the defendant had said (in denying S.'s presence on that day). He testified that S.'s face turned red and he stammered a little and turned around and walked in the store. From and by that circumstance he concluded and he swore that S. had "admitted" it.

Plaintiff's testimony showed that shortly after the marriage of plaintiff and defend-

ant, S. and his wife came to call on plaintiff and defendant and never returned. That plaintiff and defendant never visited the S. household. That plaintiff gave S. to understand he was not welcome at his home and told him if he caught him around his (plaintiff's) place "it wouldn't be good for him." Yet he seemed to think it peculiar or suggestive of misconduct that after that time "he avoided me, kindly. I don't know; he just don't act friendly."

Plaintiff offered to prove that during their married life the defendant admitted to him that she had been intimate with S. The offer was refused as a privileged communication. This we will consider further herein. There was no evidence whatsoever that defendant had ever been intimate with S. or any other man during the marriage or that S. had ever been to plaintiff's home with the one exception of the call with his wife shortly after the marriage. The evidence showed defendant to be a woman of good reputation.

Defendant testified to a series of assaults, abuse and threats, commencing with an occasion when she was about three months pregnant with her youngest child, and continuing on occasions to and culminating in being kicked (when she denied an accusation), and thereafter being choked on the Saturday night before the separation. That she was in fear for herself and her children because of the mistreatments and threats she had received, and when the husband went to St. Louis with a load of cattle she gathered her children and went to her sister's home. From there a brother took her and the children to the home of another brother in California. This brother took her to an attorney, where she "applied" for child support. This was really a suit for separate maintenance.

As to the several assaults, defendant testified that upon occasions the children would come to her aid and force plaintiff to desist. That she had on at least one occasion gone to a doctor bearing the bruises upon her body which resulted from his abuse. That the mistreatment resulted in ill health, nausea and considerable loss in weight. Plaintiff denied all but one assault. As to that, he said he was sitting on a window seat with the children when "for some reason or other she came running in there, with no reason I could see, and attacked my mother; said she was an old liar and I was a liar. Just started hitting at me and scratching at me." That when she whirled around he kicked her "on the back of the leg high up there probably." Plaintiff's mother had been dead for approximately two years at the time. He explained other incidents by saying that sometimes "me and my wife would be a-playing and wrestling around a little bit, the kids would always come in and take up for her when we were wrestling around," but that it was all in fun and that he never tried to hurt Tressie and never had several fights with her. He explained the bruises on his wife's leg by stating that she had fallen down some stairs. He suggested that on an occasion when his wife said he choked her in bed it could be possible he had done it in his sleep, because once when sleeping with another man he had struck his bedfellow in the eye.

From the foregoing facts, and more, the court found against plaintiff on his petition, found defendant to be the innocent and injured party and awarded her the divorce, awarded care and custody of the three children to the plaintiff from June 10 to August 25 and to the defendant for the remainder of each year. Defendant was granted permission to take the children to the State of California, the plaintiff to call for and return the children at his expense; and it was adjudged that defendant recover the sum of $80 per month for the support of the children during the nine-month period in which she had the children, the sum of $1,000 alimony in gross and the sum of $350 as attorneys' fees.

On defendant's motion after appeal, she was allowed the further sum of $50 suit money and $150 as attorneys' fees.

■ One of plaintiff's assignments is that the court erred in refusing his offer to testify as to admission made by his wife in respect to alleged intimacy with S. Such

offer was refused as being a privileged communication. The offer does not show whether the alleged admission was as to matters which occurred *before* or *after* the marriage relationship commenced. The plaintiff's statement preceding the offer indicates that the alleged communication was made early in the marriage, since which time the parties had lived together through the years and had children. Furthermore, the offer did not set forth the words by and with which the alleged admission was made, and in view of the plaintiff's free use of the word in interpreting certain facts to constitute an "admission" in reference to another incident, we have grave doubt as to whether the offer was sufficiently specific. However, we think the offer clearly falls within the rule which excludes confidential communications between husband and wife where the privilege is not waived. This was the common law and it is preserved by statute. Section 491.020 RSMo 1949, V.A.M.S.; Revercomb v. Revercomb, Mo.App., 222 S.W. 899; Kistner v. Kistner, Mo.App., 89 S.W.2d 106; Allen v. Allen, Mo.App., 60 S.W.2d 709, 711.

It is true that in certain instances so-called exceptions to the rule have been made. Some of such instances arise where there is a criminal prosecution for wrong against the spouse, where there has been a physical or verbal assault, where the husband and wife have been engaged in business transactions with each other, and in an accounting case, to prevent fraud. The reason usually given is ex necessitate rei. Appellant has cited us a number of cases on this point. It would serve no purpose here to distill and taste the essence of each case so cited. All of them fall within the recognized "exceptions" and none of them involve the type of communication offered in this case. Wigmore (3rd Ed.), sec. 2336, states the rule as follows:

"The essence of the privilege is to protect *confidences* only. * * * The chief question must be, for the present privilege, merely whether *confidence* or privacy is to be *presumed to have been intended*, in all marital communications, until the contrary appears, or whether the burden of showing the intention of privacy should be upon the person claiming the privilege. It would seem proper that *all* marital communications are by implication confidential, and that the contrary intention must be made to appear by the circumstances of any given instances."

It would be difficult to conceive of any communication which could be *more* confidential than that which is alleged to have occurred here. We hold that the offer of such was properly refused.

■ Another of plaintiff's assignments is that the evidence of defendant was not sufficient because not corroborated by other evidence. There is no inflexible rule which requires corroboration in a divorce case. Lowe v. Lowe, Mo.App., 229 S.W.2d 7; Dunlap v. Dunlap, Mo.App., 255 S.W.2d 441, 442; Stevens v. Stevens, Mo.App., 158 S.W.2d 238; Hupp v. Hupp, 238 Mo.App. 964, 194 S.W.2d 215.

■ To hold that corroboration is required in all instances could and would defeat justice in certain instances where the wrongdoer was so crafty, or the injured person was so unfortunate, that all of the wrongs occurred in complete privacy. It has sometimes been said that the necessity of corroboration is at the discretion of the court. We think that a court might look askance upon the testimony of one of the parties alone where the circumstances indicate that such evidence, if true, could conveniently be corroborated and the absence of corroborating evidence is unexplained. But in this case there was corroboration to considerable extent from the testimony of the plaintiff himself. The highway patrolman to whom the defendant talked the day or evening after the choking incident testified that her neck was red or possibly bruised. The absence of the doctor (to whom she went after the kicking incident) is explained. We agree with the finding of the trial court that the defendant was the innocent and injured party, and the evidence in support of such was ample.

There remains only the question of whether the award of the court was excessive.

■ Plaintiff is forty years old and apparently able-bodied. He is a farmer, has done some custom work and worked on a railroad for a period. Defendant is thirty-eight years of age, has had some illness, has had some experience teaching country school prior to her marriage but will require at least a year of college to prepare herself to resume that vocation, which she says is her intention and for which she believes she is or will be fitted. She has no means of her own and has been living off the charity of a brother and a sister. The parties are the owners of a 270-acre farm, title to which is held by the entirety. This farm is well-fenced and has a dwelling house which is not completely modern. The land is principally rough pasture, very little of it tillable and not much of it mowable, and the highest value placed on it by any witness is $5,000. Computed on such basis, plaintiff's interest in the farm is worth $2,500. He has some milk stock, a herd of goats, a tractor now three years old and some other machinery. Values placed on this personalty run from $3,000 to $4,000. On the other hand, plaintiff owes debts (the principal portion of which is represented by chattel mortgage against the personalty) which in total amount approximately equal the value of such personalty. No bank account was shown. Plaintiff reported a net income for the year 1952 in amount of $1,500. The judgment, with attorney's fees and the suit money, totals $1,550, exclusive of costs of the case, which we think plaintiff should pay. We think the award of $1,000 alimony in gross to defendant was just. She will require at least that much to complete her schooling and prepare to reenter the teaching profession. Likewise we believe the award of suit money and attorneys' fees was reasonable. However, we are inclined to the belief that the award of $80 per month for support of the children, while certainly not in ex- cess of their needs, is excessive and might under the existing circumstances destroy incentive and possibly defeat the purpose sought to be accomplished in the end. The complaint for separate maintenance filed by the defendant in the State of California stated that the sum of $30 a month is a reasonable sum to be allowed for the support and maintenance of the respondent and the minor children. While we do not hold the respondent to this allegation (there could have been various reasons for the naming of such a moderate amount), still we accept it as giving some indication of the respondent's view of plaintiff's ability to pay.

■ In determining matters of this kind we hear the case de novo, and it is our duty to examine the whole record and reach our own conclusions, giving due deference to the decision of the trial court which had the opportunity of observing and hearing witnesses as they testified. We are required to consider the health, age, needs, obligations, dependents, income and the capacity to produce income of the parties. Coggburn v. Coggburn, Mo.App., 256 S.W. 2d 836; Simon v. Simon, Mo., 248 S.W.2d 560; Carr v. Carr, Mo., 232 S.W.2d 488.

The judgment of the lower court will be affirmed in all things, except that the amount of support money for the minor children is reduced so and to the effect that the defendant shall have and recover of and from the plaintiff the sum of $50 per month during the nine months of the year for which custody is adjudged her, and for any additional period in which plaintiff shall not exercise his right to custody as is set forth in the judgment. All costs are taxed against the plaintiff. The trial court is directed to make such orders in the matter as are in conformity with the views herein expressed. It is so ordered.

McDOWELL, P. J., and STONE, J., concur.