Marie L. AMES, Respondent,

v.

G. Walter AMES, Appellant.

No. 22300.

Kansas City Court of Appeals.

Missouri.

Nov. 7, 1955.

Jayne & Jayne, Kirksville, for appellant.

J. Andy Zenge, Jr., Canton, for respondent.

BOUR, Commissioner.

This is a divorce case. The defendant husband filed an answer and cross-petition. Both parties relied upon alleged intolerable indignities as grounds for divorce. Plaintiff dismissed her action before trial. The trial resulted in a judgment denying the defendant a divorce on his cross-petition, and he has appealed.

Plaintiff and defendant were married on February 13, 1920. After the marriage they lived on a farm in Sullivan county, Missouri, until the spring of 1923, when they moved to Kirksville, Missouri, where they lived together until the separation. Their only child, Donald, was 18 years of age at the time of the trial. Defendant left the plaintiff on January 24, 1954; plaintiff filed her petition for divorce on April 2, 1954; defendant filed his answer and cross-petition on May 18, 1954; plaintiff was allowed to dismiss her petition on November 12, 1954, and on the same day the case went to trial on defendant's cross-petition.

The evidence showed that at the time of their marriage neither plaintiff nor defendant owned any property, and that when they left the farm in 1923 they had "nothing but some debts". Since that time defendant has never been unemployed. He worked for the Douglas Motor Company in Kirksville about three years. From 1925 to 1942 he worked for the State Highway Department. From 1942 until 1945 he worked five days each week as assistant

foreman of the ordnance shop at Fort Leonard Wood. During that period he returned to his home in Kirksville every Friday night, and by working at the Hayward Motor Company on Saturdays he earned about $4,600 a year. From 1945 to 1950 he worked as a mechanic in Kirksville; and from 1950 to 1952 he worked at Fort Leonard Wood. At the time of the trial, and for about two years prior thereto, he was maintenance engineer at the Laughlin Hospital in Kirksville and was earning $3,600 a year.

It appeared that plaintiff worked during most of her married life. Defendant testified that plaintiff taught in a rural school for one year, and that after they moved to Kirksville "she kept roomers and boarders". In 1925, plaintiff enrolled as a student in the Northeast Missouri State Teachers College at Kirksville. She testified that she finished her college work in three years by attending summer sessions, and continued: "But during all that time I worked. I kept roomers and boarders and I did teach for two quarters at the Teachers College." From September 1928 until the spring of 1933 she was a member of the faculty at Senior High School in Kirksville and earned $150 to $155 a month. She testified: "In 1933 we were laid off. Most of the married teachers were laid off in that year." Thereafter, plaintiff gave dancing lessons and worked as a recreational playground director in the summertime. In 1936 she accepted a position in Kirksville with the Girl Scouts, at a salary of $25 a month. Her salary was increased from time to time, and in 1948 she was promoted to an administrative position and her salary increased to $200 a month. She was so employed by the Girl Scouts at the time of the trial. Plaintiff also did certain research work for the University of Michigan, which paid her $300 to $700 a year. It appeared that she had been doing such work since 1945. Plaintiff testified: "(H)e always felt that I should work and he thought it was my responsibility to help pay the debts and I was very willing to do that." Defendant said he "didn't want her to work".

In 1932 the parties bought two houses in Kirksville for $6,500 and plaintiff made a down payment of $250. They gave a deed of trust to secure the payment of the balance of the purchase price. Defendant testified: "Now then, who made the payments on those houses as they became due? A. I paid a hundred dollars a month and she (plaintiff) paid some extra. Sometimes we would pay $200 and she would put in a hundred of her money." One house was sold in 1941 for $4,750 and the other in 1952 for $7,260. Defendant testified that the sum of $4,750 "was used to pay off what we hadn't already paid off, except about a thousand dollars * * * and that was paid off" at a later date. In 1946 the parties acquired a five-acre tract in Kirksville. The deed to this land was taken in the names of plaintiff and defendant as tenants by the entirety. In 1948 they had a contractor build a six-room house on this land. Plaintiff and defendant did part of the work. In order to build the house they obtained a loan from the Kirksville Building and Loan Company. At the time of the trial the unpaid balance of that loan was $2,000. The parties and their son were living in this house at the time of the separation in January, 1954, and plaintiff and the son were living there at the time of the trial. Plaintiff testified: " * * * the acreage bought was $950 that was furnished by me and then I borrowed $300 from my folks to finish out the payment * * *, and then when we started building in 1948 I happened to have enough money in the bank to take care of—oh, getting the thing started, * * * and since then I have made the monthly payments at the Building and Loan, and each year I have figured about six hundred dollars out of my income went into the place." She testified that the sum of $7,260 which the parties received for the house sold in 1952 was deposited in her separate checking account; that she paid $3,000 of that amount to the Building and Loan Company; and that she paid the balance due on a note held by a bank. She further testified that she bought a stove, a refrigerator, and a living room suite with her own money.

The evidence showed that defendant had maintained a checking account with the National Bank of Kirksville for about thirty years; that he deposited most of his earnings in this account; that plaintiff was authorized to draw checks against this account; and that after plaintiff became employed she maintained a separate checking account with the same bank.

Defendant testified that he always tried to treat plaintiff "as good as (he) could" and do whatever she wanted done; that when they built the house in 1948, he "hauled all the sand and gravel for it"; that after working all day in a garage he would work on the new house until nine or ten o'clock at night; that his son had two or three cows; and that he, the defendant, milked the cows twice a day and paid for their feed. He admitted on cross-examination that plaintiff worked on the house; that "she painted on the house" and "did other physical labor connected with it"; that when he "went there and worked, she did the same"; and that on one occasion plaintiff paid for twenty bales of hay.

Defendant testified that his marital difficulties began about the time the new house was completed, and "then just kept getting worse"; that he couldn't do anything to please the plaintiff; that she was quarrelsome and had "mad fits"; that on several occasions she refused to prepare his meals; that she would get mad at him and "go to fighting", throw things at him, and hit him "with anything she could get hold of"; that on one occasion she knocked his glasses off and broke them. He continued: "Q. How many times, within the year before you left home, did occurrences of that kind happen? A. Oh, there were five or six of them." He complained that she was extravagant, but admitted on cross-examination that she was a good housekeeper, that she did not spend money on liquor, that she always wore inexpensive clothing, that she did not spend money "on extravagant eating" or give parties, and that she worked most of the time. He said that she "wanted to buy stuff at times" that they did not need.

Defendant testified on cross-examination: "Q. Did you ever break her glasses, Mr. Ames? A. * * * (W)hen she come down *of* the steps there and she hit me and knocked my glasses off, her glasses fell off and it broke them at the same time. * * * I was trying to get away from her and went out the back door and she struck at me and knocked my glasses off * * * and I never even hit her. I tried to hold her to keep her from hitting me." In describing this incident, plaintiff said: "Well, that comes back to the check that was given at the post office for box rent. * * * I came home late * * * and he was inside the house, and I said, 'I wish you had told me that you had closed your checking account at the bank, because I was called in at the post office about this check * * *, and he (defendant) said the account was not closed * * *. So I asked him to give me the postal key. * * *, and he refused to give it to me, and * * * I said, 'Just keep the key if you want to, but I am paying for the box from now on.' So he became very angry and finally said, 'Well, if you have paid for the box, I will give you the key', so he got the key and gave it to me, and I was standing in the kitchen door, which is two steps up from the breezeway, and he was standing on the first floor of the breezeway, and he knocked my glasses off * * * and they went clear across the breezeway and were broken all to pieces. So a scuffle followed and in the scuffle his glasses were broken."

Defendant testified that on one occasion plaintiff threatened to hit him with a milk bottle. He said: "She didn't strike me, but * * * she had a milk bottle in her hand. * * * She drawed back with it." The son, Donald, testified: "I was in the front room and they were quarreling in the kitchen * * * and I went to the door and he was starting out the door and he said, 'Call her off', and I did absolutely nothing and the fight ended right there. * * * She had it (the bottle) in her hand. Q. Did she draw back with it? A. No. * * * Q. Did she make any

effort to hit him with it? A. I don't think so, no. * * * I didn't see her try to strike him, no. She was washing dishes there in the sink." Donald said he did not know who started the quarrel.

Plaintiff's version of the milk bottle incident was as follows: "I was washing dishes and I suppose among those were milk bottles * * * and he came in * * * something had gone wrong, out of feed for the cows or something and no money to buy feed, and what was I going to do, * * * and he left the door open or was standing there with the door open * * * and the argument continued about this feed * * * and I said, "Well, if you want to argue about that * * * come inside and close the door, and I came over with some bottles for the rack, and he said, 'Well, what you are trying to do is push me out of my own house', and I said, 'I am not trying to push you anywhere, but I just want you to close the door because it is cold * * *', and so he refused to do it. * * * I probably did take hold of the door to push it to, when he said I was pushing him out of the house * * *." Plaintiff said that she "did not attempt at that time or at any time to strike him with the milk bottle or anything of the kind".

Mrs. Grace Goodwin and Mrs. Betty Ray, witnesses for defendant, testified that they lived near the parties for several years, and that about two years before the trial they saw plaintiff and defendant engaged in "an altercation". Mrs. Goodwin said that plaintiff "had something in her hand", and "she was beating Mr. Ames over the head". Mrs. Ray testified: "Mrs. Ames was whipping Walter (defendant) with something. We thought it was a cardboard box, but I am not certain." Both witnesses testified that they heard plaintiff say, "I have put up with you for 32 years and I don't intend to put up with you any longer"; that they did not see defendant strike the plaintiff; and that they did not hear defendant's voice. When plaintiff was asked, "Did any such thing as that occur?", she said, "It did not." She further testified: "Did you ever start a fight with him? A. No. Q. Did you ever strike him unless he had struck you? A. No."

Defendant testified that on one occasion plaintiff asked him "to deed the property to her and the boy", and that when he refused to do so she got mad and said she ought to beat his brains out. This was denied by plaintiff. She testified: "(H)e said back in 1952 that he * * * wanted to cash in and get everything he could get; that he wanted a divorce. * * * I realized then that things were not as stable as I had thought or hoped, * * * and I felt that the thing we should do at our age, that we should deed the property to Donald, our son, with a life estate reserved * *. Q. Do you still think that? A. Yes."

Plaintiff testified that on one occasion in the fall of 1953 defendant threatened to kill her, and continued: "The boy had a shotgun in his room. * * * I was inside, in the living room, and he (defendant) had been outdoors working and he came in real mad about something * * * and he said he was tired of everything out there and he wanted to get away, and pretty soon * * * he was just jumping up and down on the floor and he said: 'I think I am losing my mind', and he started jerking the chairs and setting them down very hard on the floor, and I asked him not to do that and tried to be calm * * *. I just didn't know what it was all about, I never did see him act like that. * * * He said he was going to get the gun and wanted to shoot me and shoot himself, and I blocked the hallway door to keep him from going in there, and he did have on a sweat shirt * * *. I kept ahold of him to keep him from going in there, and by the time we were able to get him calmed the sweat shirt was pretty well torn, and I was really exhausted * * *. I was bruised across the chest. Q. How did that come about? A. Well, I just suppose in the scuffle * * *. So I finally got him calmed * * * and tried to reason with him * * * and he did reason a bit and then left and seemed to be all right." When the son, Donald, was asked whether

he remembered "something about a shotgun last fall", he said: "Yes. * * * When I came home * * * my mother was upset, and I helped to straighten the rug. Q. Was there any torn clothing around there? A. Yes. * * * There was a sweat shirt * * *. Q. Your father's? A. Yes. And I put my shotgun away and my shells, upon instructions, and she was bruised." Defendant testified on cross-examination: "I never talked to her about a shotgun. Q. You never said anything about a shotgun? Never said to her that you would shoot her and yourself? A. Never did."

As stated, defendant left the plaintiff on January 24, 1954. Defendant testified: "Q. What caused you to leave home? * * * She fussed because I was going to bed and she said that bed belonged to her and I couldn't sleep in it and I didn't have to, and I left. * * * (T)here had been several times before that she got mad about something and she would go to fighting me and I would try to hold her to keep her from hurting me, and if I could leave, I would leave, and some nights I stayed down at the Dockery Hotel * * *." Referring to the separation, plaintiff testified: I was in the living room doing some work and he came in and on the table was a letter from the Kirksville Building and Loan in regard to a payment which was delinquent, and he started to go upstairs to go to bed, and I said to him, 'There's a letter on the table there', and he came back down * * * picked up the letter * * * looked at it and started on upstairs, and I said, 'We will have to do something about this payment that is delinquent.' I had been making the payments from my own checking account and I was perfectly willing to go ahead and continue the payments if the 1953 taxes were paid—it was part of our contract with the Building and Loan and I told him I would be very glad to dispose of that matter, but I felt he should do something about the '53 taxes. He didn't say anything. He went upstairs, took the letter with him, and it wasn't but just a little bit when he came back and left, not saying a word. There were no words. * * *

Q. Was any bed mentioned? A. No." She testified that she never complained when defendant went to bed early; that defendant said she "would sleep late and stay up all night", and continued: "I had work to do because of holding a job in town and working at home. * * * On Sunday mornings I would sleep late, especially the last two years. * * * I have a heart injury * * *."

The parties' son, Donald, testified that disputes which arose between his parents were "mostly over money matters"; that he "never heard a quarrel unless it originated around a bill"; that on such occasions his mother would ask his father whether "he was going to pay the bill and sometimes he would say flatly no"; that "there would be checks turned down at the bank, and she would ask him about these checks and he would blame her for the overdrafts, and then she would ask him if he was going to pay bills", and he would say, "Well, just as soon as I get the money." He further testified that his father was "sullen most of the time"; and that he never saw his mother strike his father. He said his father "had as much freedom as he wanted", and that his mother was not domineering.

Defendant testified that after the separation in January, 1954, he permitted the plaintiff to draw checks against his account; that on April 1, 1954, he "went over to the bank and found that she had taken all of the money out in cash"; that he instructed the bank not to honor any more checks drawn by plaintiff against his account; that on the following day plaintiff filed a petition for divorce; and that since that time he had paid "the 'phone bill and the light bill and the water bill"; and that after the separation he milked the cows and bought their feed, and continued to do so until April 2, 1954. He testified on cross-examination: "Q. I say since January, Mr. Ames, have you furnished them with anything to eat since you left out there? A. No. * * * Q. Do you know what they have been living on? A. No. Q. Do you care? A. Well, yes, I

would care. If they was starving I would care." When plaintiff was asked whether she continued to draw checks on defendant's account after the separation, she said that she did "on a few occasions"; that she "drew enough to just barely pay the utilities and not all the grocery bills".

Defendant charged in his cross-petition that "plaintiff deliberately undertook to place defendant in a bad light with members of the family and to alienate members of the family from defendant". There was no substantial evidence to support this charge.

Warner Mills, vice-president of the National Bank of Kirksville, testified that he had known plaintiff and defendant for 25 or 30 years, and that defendant was honest and industrious. He said that plaintiff bore a good reputation in the community; that she was a woman of honor and integrity; and that she "always worked".

█ Defendant contends, of course, that the court erred in denying him a judgment of divorce on his cross-petition. As stated, defendant has based his case on a charge of indignities which he claims rendered his condition in life intolerable. Although each divorce action based on alleged general indignities must be determined on its own facts, the courts have said repeatedly that indignities, such as to warrant the granting of a divorce, ordinarily must amount to a continuous course of conduct. A single act, or occasional acts, will not suffice. The acts relied upon must amount to a species of mental cruelty, and must evidence a course of conduct by one of the parties toward the other whereby the other's condition is rendered intolerable through acts of such character and frequency as to be subversive of the family relation. Cadenhead v. Cadenhead, Mo.App., 265 S.W.2d 426, 435 and cases cited.

██ The evidence in the instant case has been set forth rather fully and it is unnecessary to review it here. If defendant's evidence be accepted as true, he was entitled to a judgment of divorce. There was, however, an irreconcilable conflict in the testimony. It is our duty, of course, to review the whole record and reach our own conclusions in divorce cases, but where, as here, there are irreconcilable conflicts in the testimony and the decision depends largely upon the credibility of the witnesses and the weight to be given their testimony, we must give due deference to the conclusions of the trial judge who saw and heard all of the witnesses, and we are not authorized to set aside the judgment unless clearly erroneous. Section 510.310, subd. 4 RSMo 1949, V.A.M.S. Under the record, we cannot say that the judgment of the trial court was clearly erroneous.

The judgment should be affirmed, and the commissioner so recommends.

SPERRY, C., concurs.

PER CURIAM.

The foregoing opinion of BOUR, C., is adopted as the opinion of the court. The judgment is affirmed.

All concur.