Dorothy A. CLARK, Respondent,

v.

Wray A. CLARK, Appellant,

No. 22602.

Kansas City Court of Appeals. Missouri.

Nov. 4, 1957.

Robert S. McKenzie, Jack G. Beamer, Stubbs, McKenzie, Williams & Merrick, Kansas City, for appellant.

George V. Aylward, Francis L. Roach, Kansas City (Edward F. Aylward, Kansas City, of counsel), for respondent.

HUNTER, Judge.

This is an appeal by defendant, Wray A. Clark, from the judgment and decree of

divorce granted plaintiff, Dorothy A. Clark, by Division 4 of the Circuit Court of Jackson County, wherein defendant was ordered to pay plaintiff alimony in the sum of $65 per week, child support in the sum of $20 per week, additional attorney fees of $1,250, and awarded child custody to plaintiff, with specified week-end visitation times and one month's custody, July, to defendant, and from the dismissal therein of defendant's cross-petition for divorce.

The trial was lengthy. The resultant transcript consists of some 435 pages, plus exhibits. It will serve no useful purpose to set out the evidence in detail, and we undertake to spare the reader as many of the particulars of the unhappiness and conflict in this marriage as we reasonably can by setting forth in this opinion only the gist of such of the testimony as bears upon the questions raised on this appeal.

The Clarks were married September 24, 1932, at Clayton, Missouri. He was twenty-one and she was four or five years older. He sold sausage and eggs from door to door. Soon thereafter he worked in his father's shoe polish factory until it closed. He purchased a truck and engaged in the trucking business until 1941. Meanwhile he learned to fly an airplane and served during World War II as a flight instructor. In 1944 he became a pipeline aerial patrol contractor for the Great Lakes Pipeline Company. In 1945 went to work as a commercial pilot for the Ozark Airlines. In 1946 he re-entered the employment of the Great Lakes Pipeline Company as an executive pilot. He still holds this position, and has a gross annual salary of $10,400. He also has $11,497.33 in a bank account, $2,000 in a credit union, $2,000 in corporate stocks, and with plaintiff jointly owns a house worth about $9,000. The Clarks lived in St. Louis until 1946 when defendant obtained employment requiring him to live in Kansas City. In 1933 their daughter, Dorothy Ann, was born. In 1943 a son, Bill, was born. In 1953 Dorothy Ann married and now resides with her husband. At the time of the trial in July, 1956, Bill was thirteen, and in the fall would be in the ninth grade in a public school.

In support of her allegation that defendant had offered her such indignities as to render her condition in life intolerable, plaintiff adduced evidence to the following effect: She was truly in love with her husband when they married and for some ten years thereafter. Their marital relationship during that time generally was both enjoyable and satisfactory. Her affection for him commenced to fade about the time their son, Bill, was born when defendant got out of the trucking business and bought his own airplane. He then began spending his week-ends on Mosentine Island, and eventually asked plaintiff and their daughter to go along. He would "dump" them at one end of the island, leave them all day and go visit others on the island. Then in the evening they would go across to the mainland to a tavern, and "He would consort with some woman there that was drunk all the time, chase her out in the bushes, put cockleburrs down her blouse and come in and just generally humiliate her (plaintiff) in front of everybody." In their personal relationship, through the years he would press his attentions on her regardless of the time of the month or that she might then be sick. When Bill was about two years old (and about a year before they moved to Kansas City) plaintiff and defendant were having altercations. To aid in their reconciliation defendant invited her to accompany him to a night club in Springfield, Missouri, where he was working for Ozark Airlines. At the night club he ignored her and left her sitting while he danced with another woman. He was drunk and fell down with this other woman in the middle of the floor. All this greatly humiliated plaintiff. Later when she asked him why he treated her that way he said he just did it to punish her, to embarrass her; that he got mad all over again when he saw her. On another occasion, about 1947, he got up from a nap and proceeded to go to the bathroom without closing the door, although this exposed him to plain-

tiff, her daughter and a young man visiting the daughter. Later, when asked by plaintiff why he did it he said it was to embarrass her.

Defendant's new and better paying employment with Great Lakes Pipeline Company necessitated his moving to Kansas City. They had not been getting along and were continuing to have altercations. She was reluctant to move. He gave her the choice of going to Kansas City or getting a divorce. She elected to get a divorce. However, he persuaded her to come to Kansas City, and to give up any divorce action. They purchased their present home on Garfield and moved into it. Defendant would treat her like a child that had to be punished at times if she didn't do the things he required of her. He was dominating and she had to submit her will to everything he wanted done. Several months later, believing that things were not going to work out, she left him and returned with the children to her parents' home in St. Louis where she discussed her problems with an attorney and eventually filed suit for divorce. Meanwhile, he had filed suit for divorce in Kansas City and obtained service on her before her suit was filed. Within a week he came to St. Louis and persuaded her to reconcile and to return to Kansas City. The two divorce actions were dismissed. Their marital difficulties continued. In April, 1953, plaintiff again filed suit for divorce. Their daughter, Dorothy, eloped and married. Defendant threatened plaintiff that he would bring morality charges against Dorothy and her husband unless plaintiff dropped her divorce action. This she did. The following year, comparatively speaking, was one of their more harmonious times. However, it was not free of matrimonial strife. Defendant laid down a specification that she should submit to intercourse on a schedule, such as Monday, Wednesday, Friday and Sunday. She objected that love was something you don't schedule. Numerous altercations resulted.

Another series of incidents concerning plaintiff's health began in October, 1952, when plaintiff developed cancer necessitating the surgical removal of a breast. Defendant while visiting her at the hospital would mention some friend of hers who had recently died of cancer. Shortly after she left the hospital he berated her as a coward and told her she had to die sometime. When she was in the basement doing some hammering he asked her if she was building her coffin. On another occasion when they were driving along a lonely country road he slowed down, looked at her and said, "A nice place for a murder, isn't it?" When she was winding up some nylon cord from a parachute and asked him what he would like for her to do with it, he said, "You better put it aside, you might want to hang yourself some day." Other incidents testified to were that defendant on numerous occasions cursed plaintiff and called her vulgar and obscene names; that he was hostile to the parents of the children of the neighborhood with whom his son played; that he told people plaintiff was losing her mind and was trying to poison him; that he refused to keep the house in repair and intentionally broke up furniture while angry.

While they were planning a new home at a nearby lake their daughter and her husband, who was being ordered into military service, returned to Kansas City. Defendant asked plaintiff to sign a notarized statement that he had a right to kill her dog if he found it in the proposed new house. When she refused he called off the plan to build the new home. He offended their daughter and their daughter's husband. As a result the daughter left the home in anger for a place of her own to await her husband's return to civilian life. Plaintiff moved out of defendant's bedroom.

Their situation worsened considerably. Defendant night after night endeavored to physically force his attentions on his wife and chase her around from room to room all night. She fought him off. She moved

to her son's bedroom and later to a base-
ment room. He kicked in the door of the
bedroom, and removed the basement door
lock. On September 21, 1954, defendant as
usual insisted plaintiff have relations with
him. Plaintiff had gone to bed in a sepa-
rate room with all her clothes on. She
endeavored to fight him off. In the ensuing
struggle he pulled her hair, pounded her on
on the hips and legs, causing bruises, and
pulled her off the bed onto the floor and
down the hall. He swung her into his bed-
room and slammed the door. There the
struggle continued. This struggle was wit-
nessed by two neighbor ladies through a
window. The next day plaintiff filed this
action for divorce. She received tempo-
rary allowances for support and attorney's
fees. They continued to share the jointly
owned house for about a year during which
time many additional altercations occurred
between them. We do not conceive of any
useful purpose any statement of them would
serve.

Evidence on defendant's behalf in op-
position to plaintiff's petition and in sup-
port of his cross-petition was to the fol-
lowing effect: From the beginning of their
marriage his wife was cold and distant.
She always made him feel guilty when he
persisted in having sexual intercourse with
her. She often told him she had no love
or affection for him and that he could not
buy her love. She said she loved her dog
more than she did him. She told him she
did not have to do a thing for him and he
had to provide for her as long as he lived.
She often cursed him and called him names.
She told their neighbors that he beat her.
She monopolized the son's time and made
a concerted effort to keep the son away
from defendant and to alienate the son's
affection for his father. She showed little
or no regard for defendant when he was ill,
first with hives and later with a serious
ulcer. She refused to buy and prepare food
he could eat on his ulcer diet. She resisted
every effort he made to keep the family
together. She refused to associate with his
friends and business associates or to invite

them into their home. She often clawed,
struck, kicked and bit him. Once she told
him if he ever abused her dog again she
would get a gun and kill him. Defendant
undertook to explain certain incidents to
which plaintiff testified as being caused by
his affection for his wife and her refusal
to be a wife to him. He also testified that
his daughter's lack of affection for him was
because as she was growing up his wife
permitted her too much freedom in her
choice of clothing and in dating while he
was advising the daughter to be more care-
ful of her dress, her associates, and her
conduct with them. While he did not ap-
prove of his daughter's marriage because
he thought her husband was unable to make
a satisfactory living he wanted only that
his daughter be happy.

By way of her rebuttal testimony plain-
tiff denied any wrong doing on her part
and while conceding she had upon occasion
cursed, spit at and fought defendant, it
was all in justifiable retaliation for some-
thing improper he had done or was attempt-
ing to do to her or in self-defense. Plain-
tiff was supported by corroborative testi-
mony from her daughter, from a friend of
her daughter's, and from three neighbors,
as to many of the related incidents. De-
fendant, in addition to his own testimony
by deposition adduced the testimony of a
camp counselor concerning a single inci-
dent at summer camp concerning Bill's de-
sire to return home before the end of the
camp term. The son, Bill, then thirteen,
was not put on the stand but at the request
of counsel, was interrogated by the court in
chambers.

It is on this record that defendant con-
tends the trial court erred in finding that
plaintiff was the innocent and injured party
and entitled to a divorce under Missouri
law. He also contends he was entitled to
a divorce under his cross-petition and in
the best interests of the child should have
been awarded custody of the fourteen year
old son. Further, that the amount of ali-
mony awarded to plaintiff was excessive.

While in this state an action for divorce is a statutory suit at law and not a suit in equity, it does, nevertheless, partake of the nature of a suit in equity and is triable as such by the circuit court, and de novo as such on appeal. May v. May, Mo. App., 294 S.W.2d 627; Schulte v. Schulte, Mo.Sup., 140 S.W.2d 51. On appeal it is our duty to consider, weigh and evaluate all of the competent evidence tending to prove or refute the essential factual issues and reach our own findings. Eikermann v. Eikermann, Mo.App., 283 S.W.2d 391. In so doing we are not bound by the trial court's findings but do accord them proper deference, particularly where the credibility of witnesses who appeared before the trial court is challenged. We do not hesitate to correct any errors the trial court may have made, and to enter such judgment as justice requires. Dallas v. Dallas, Mo.App., 233 S.W.2d 738; May v. May, supra; Clemens v. Clemens, 361 Mo. 485, 235 S.W.2d 342.

Defendant asserts that if we assume all the principal incidents upon which plaintiff relies occurred, they do not clearly demonstrate or sufficiently persuade that they constitute the intolerable indignities contemplated by our statute establishing grounds for divorce. Section 452.010 RSMo 1949, V.A.M.S.

Every divorce action based on claimed general indignities within the meaning of the statute must be determined on its own facts. Our courts, in varying language, have held repeatedly that indignities, such as to warrant the granting of a divorce, ordinarily must amount to a continuous course of conduct. A single act, or occasional acts, will not suffice. The acts relied upon must amount to a species of mental cruelty, and must evidence a course of conduct by one of the parties toward the other whereby the other's condition is rendered intolerable through acts of such character and frequency as to be subversive of the family relationship. Thomas v. Thomas, Mo.App., 288 S.W.2d 689, 697; Watson v. Watson, Mo.App., 291 S.W.2d 198; Ames v. Ames, Mo.App., 284 S.W.2d 888. The indignities relied upon must be intentionally committed. Thomason v. Thomason, Mo.App., 262 S.W.2d 349.

If plaintiff's evidence be accepted as true, plaintiff clearly has suffered such indignities at the hands of defendant as to render her condition in life intolerable within the meaning of the statute. For over ten years she has been subjected to an intentional and continuous course of conduct of such an insufferable and intolerable nature and frequency as to be subversive of the family relationship.

However, there were conflicts in the testimony as to many of plaintiff's charges and also as to defendant's countercharges in support of his cross-petition for divorce. Many were direct conflicts. Others were conflicts of lesser degree or differences in emphasis. It is our duty, as stated, to review the whole record and reach our own conclusions. But where, as here, the ultimate decision depends at least to some extent upon the credibility of the witnesses, we must and do give due deference to the conclusions of the trial judge who saw and heard all of the witnesses, and we are not authorized to set aside his judgment unless clearly erroneous. Section 510.310, subd. 4 RSMo 1949, V.A.M.S. This is so even though he may have heard the evidence somewhat piecemeal over a period of several days.

We do not wish to leave the impression in this case that we have reached our conclusion that the plaintiff was the injured and innocent party and entitled to the divorce, and that the defendant was not entitled to a divorce on his cross-petition and the evidence by mere deference to the trial court's findings to that effect. From our own independent review of the entire record plaintiff's testimony as corroborated by her witnesses convinces us that the trial court reached the right result in granting her the divorce and in dismissing defendant's cross-petition.

■■ In support of defendant's contention that the award of custody of the parties' fourteen year old son to plaintiff was not in the best interest of the minor child defendant accuses plaintiff of being overly protective of the boy and stresses the need of any son of comparable age for a man's guidance. We can well understand his natural anguish in not being granted full custody of the child. However, in determining such matters the rule is that the court shall decide only as the best interest and welfare of the child itself may seem to require. Section 452.150 RSMo 1949, V.A.M.S. Where the mother is the prevailing party in the divorce proceeding it is rare indeed that a court finds that the best interest and welfare of the child are served by giving over its custody to the father. Wells v. Wells, Mo.App., 117 S.W.2d 700; Wilson v. Wilson, Mo.App., 260 S.W.2d 770; Long v. Long, Mo.App., 280 S.W.2d 690. Also, it is well settled that the findings of the trial court in matters involving the custody of a minor child, while not binding on the appellate court which must review the record for itself, are nevertheless not to be lightly disturbed, and will be deferred to unless the appellate court is firmly convinced that the welfare of the child requires some other disposition. Thomas v. Thomas, supra; Lutker v. Lutker, Mo.App., 230 S.W.2d 177, 179.

■ This record presents the picture of a mother who has been properly adjudicated to be the innocent and injured party in the divorce proceeding. It contains no evidence that could be said to make her an unfit person to have the custody of the minor child. On the contrary, she has demonstrated her love, affection and care for her son in such a way as to make it clear to us that it is in his best interest and welfare for her to have his custody at the times and in the manner determined by the trial judge.

■ Defendant's last contention of error is that the amount of alimony awarded plaintiff is excessive. Of the amount awarded $20 per week is for child support and $65 per week is for alimony. Defendant's present salary is $10,400 gross income. According to his own testimony his present take home pay is approximately $700 per month. His other assets and his financial condition have been described previously herein. In fixing the amount of alimony, if any, to be awarded the wife who has prevailed on the merits of the divorce proceeding, certain factors almost invariably enter into the determination. These factors generally are the financial status of the respective parties, including the question of their individual estates, incomes, obligations and necessities; the contributions of each to the accumulated property; the probable future prospects of each; their respective ages, health, ability to follow gainful occupations; their stations in life; their children, if any; the duration of the marriage and whether it was one of affection or convenience and the conduct of the parties. Simon v. Simon, Mo.Sup., 248 S.W.2d 560; Spivack v. Spivack, Mo.App., 283 S.W.2d 137; Sellars v. Sellars, Mo. App., 274 S.W.2d 509. Taking into consideration such of these recognized factors as apply to the instant case, we do not believe that the amount of alimony awarded plaintiff is excessive. On the contrary the award made is supported by the evidence and is reasonable under the circumstances of this case. Section 452.070 RSMo 1949, V.A.M.S. We see no reason to disturb it. If, in the future, the circumstances of the parties change so as to warrant a review of the matter and a change in the alimony, the trial court is adequately impowered on proper application to hear and determine it. Section 452.070 RSMo 1949, V.A.M.S.; Schulte v. Schulte, supra; Jourdan v. Jourdan, Mo.App., 251 S.W.2d 380.

We conclude that for the reasons stated the judgment of the trial court should be and is hereby affirmed in all respects.

All concur.