**Charles V. GICINTO, Plaintiff-Respondent,**

v.

**Marie Dorothy GICINTO, Defendant-Appellant.**

No. 24590.

Kansas City Court of Appeals.

Missouri.

April 3, 1967.

Henry H. Fox, Jr., Kansas City, for appellant.

Donald W. Browne, Cope, Browne & Cope, Kansas City, for respondent.

MAUGHMER, Commissioner.

Plaintiff husband sued for divorce. The defendant wife countered with a petition for separate maintenance. The judgment granted plaintiff a divorce, dismissed defendant's cross action for separate maintenance and awarded custody of the 16 year old son to the defendant with an allowance of $100 per month for his support and maintenance. Defendant on her appeal asserts that plaintiff failed to prove that he was the innocent and injured party and prays for a reversal outright of the decree of divorce. No other assignment of error is presented.

Charles V. Gicinto and Marie Gicinto were married to each other on January 31, 1942, in Olathe, Kansas. Plaintiff said that his wife on four different occasions in 1946, 1949, 1952 and 1953, filed suits against him for divorce or separate maintenance. However, each time their difficulties were partially resolved and no action was pressed to final determination. These parties finally separated about March 1, 1965, and on November 15, 1965, plaintiff filed the instant suit for divorce. Three children were born to the union but at the time of trial on March 11, 1966, two were of age and emancipated. The other, Marion Carl Gicinto, was 16 years of age.

Apparently Mrs. Gicinto has never been employed outside of the home. At the time of the marriage, Mr. Gicinto was a truck driver. For several years prior to the divorce he worked as automobile salesman for Miller Pontiac in Kansas City. On July 8, 1953, plaintiff was sentenced to serve a ten year prison term in the Federal Penitentiary at Leavenworth, Kansas. He was incarcerated in that institution for six years and until about October, 1959, when he was released on parole. During this

period his wife received federal aid of $100 per month for support of the minor children. This income was supplemented by help from relatives.

The evidence shows that plaintiff provided for his family adequately, from a financial standpoint, except for the time he was in prison. He was injured while driving a truck prior to his imprisonment and was paid $6500 in damages. After his release from Leavenworth he resumed life with his family and worked first as a truck driver and then as an automobile salesman. He had substantial earnings. He estimated that his earnings averaged $600 per month gross. The W–2 report of wages received in 1965 shows that he was paid $7,758.12. His income tax return for 1963, a period during which he was driving a truck, and prepared by H & R Block, showed a gross income of $8,728. It is conceded that he paid the bills and supported his family. His parole was terminated on November 12, 1965. From March 1, 1965, the date of the final separation, until parole termination date, he paid the family house rent, household bills, doctor bills and $45 monthly in addition as support for Marion, the minor child. After the suit for divorce was filed and under order of court he paid $160 monthly as temporary alimony and $60 monthly as child support. It was necessary for plaintiff to secure approval or consent from his parole officer in order for him to live separate and apart from his family. This permission was granted but on condition that the family support contributions as herein listed be made.

Mr. Gicinto was asked to "tell the circumstances pertaining to the separation." We summarize his answer: "She and my son Joey gave me the ultimatum to move out. They told me to move out or they were going to put my clothes out". "They put new locks on the doors so I couldn't come in." "Well, she was constantly arguing with me, falsely accusing me at all times of going out with other women when I was at work trying to sell a car. Then when I was driving on the road I'd notify her every night where I was at, where I was staying, called her every night. There was no girl there I was staying with but she would call there all hours of the morning, three or four o'clock in the morning and get me up and accuse me of being with Helen or with someone else; just always degrading me, always telling friends, people I done business with that I was an ex-convict. I wasn't to be trusted. I was no good. Just constantly arguing with me all the time, making my life, kept me in such turmoil I couldn't no longer sell cars or even work. I would be constantly pushing her off, trying not to argue with her, her false accusations. She kicked my shins, tried to argue, she pinched me, kept me up all hours of a night, constantly pinched me, kicked me. She threatened that she would send me back to prison and called Mr. Owens, my parole officer"; "they almost succeeded by calling a man on some checks on account they had bounced * * * I found two hundred some dollars in checks written on my account signed by my son Joey"; "Joey admitted this to the parole officer." Plaintiff said his wife called his boss and "all the people I sold cars to," "said she was going to bankrupt me, break me, destroy me." Plaintiff said his wife and sons charged $2520.94 to him at Macy's. "She was cold and indifferent. She wouldn't have nothing to do with me"; "she said I was an old man, was this and was that, just everything; just didn't like me, * * *. She hated me, she couldn't stand me." Plaintiff said when he first came home from Leavenworth defendant was living with her folks. "I got extra jobs, bought them a house in Independence, new furniture, and an automobile"; "they didn't like to live out there and Marion wouldn't go to school out there. He transferred to Northeast and I had to pay $225 tuition and she drove him back and forth," "then I rented a house at 326 North Quincy for $95 a month. I had to sell the house at a loss." Mr. Gicinto said he bought a life insurance policy on his youngest son when he was born but the insurance

man told him his wife had signed his name and cashed in the policy.

Mr. Earl Miller, President of Miller Pontiac, testified that Mrs. Gicinto called him "possibly two or three times to inform me what was going on, did I know what was going on"; "I don't recall she actually asked me to fire Charlie". Mr. Miller said she made reference to his going out with other women. He said that in his business association with Mr. Gicinto he had found him to be honest. Mr. Donald Sloan, who worked with Direct Transports when plaintiff was a driver there, said Mrs. Gicinto told him "she would like to put Charlie away or get even with him." He also heard her accuse her husband of running around with other women. Clarence Gicinto, plaintiff's brother, said defendant called him on numerous occasions about 4:00 a. m., complained about Charlie, said she was going to put him back in jail. He said she called him (the brother) an s. b. right on the street.

Mrs. Gicinto testified that plaintiff would come home "at two or three in the morning. He had been drinking. He had makeup all over his shirt and lipstick on his face. He never had an explanation." She admitted that she went to the home of Rose Ann Leach (one of the women she accused her husband of running around with) at 4:00 p. m. Her husband and Rose Ann's two small children were there. The defendant just opened the door and walked in. Mrs. Gicinto said that at the time she remarked to them: "I guess I caught you right. You told me Charlie had never been in your house." It was plaintiff's explanation that this woman and two others were "bird dogging"; that is, locating prospective automobile purchasers for him. Defendant says that she has asthma and diabetes and that the young son also has asthma. She admitted having had the locks on the house changed. She said the reason was that they heard the landlord downstairs one day and didn't want him to have access to their quarters. However, she admitted she never

gave a key to her husband and her 23 year old son Joey ordered him to leave. She admitted the large unpaid Macy account but said it was an accumulation of several years. She and her son Joey accused plaintiff of regular drunkenness, and said he often cursed Mrs. Gicinto. Joey said he saw his father take Rose Ann Leach home one afternoon and saw her kiss him. Mrs. Gicinto disclaimed any knowledge as to what happened to the youngest child's insurance policy although she denied having cashed it.

■ The scope of appellate review in a divorce case was aptly set forth in these words (Heibel v. Heibel, Mo.App., 366 S.W.2d 37, 40):

"The scope of this court's review in divorce cases is too well known to require citation. We try such cases de novo on the record before us and reach our own conclusions. We will apply the rule of deference where there is a sharp conflict in the evidence since the trial court had an opportunity to observe the witnesses upon the stand, but this does not mean that we can invoke that rule to avoid our duty and responsibility to reach our own conclusions from a review of the evidence."

■ For indignities to amount to sufficient grounds for divorce they must be such "as shall render his or her condition intolerable." Trivial quarrels and disagreements due to a lack of conciliatory temper in both parties cannot be reckoned as "intolerable indignities," and constitute no grounds for divorce. Capps v. Capps, Mo. App., 65 S.W.2d 661, 663.

"In divorce action by husband on ground of indignities, evidence, which revealed that indignities complained of were scattered and remote and inconsequential, was not sufficient to establish a settled or continuous course of conduct which indicated hatred, contempt, or estrangement or to establish any great in-

jury suffered by plaintiff". Moore v. Moore, Mo.App., 337 S.W.2d 781, 782, syll. 9.

On this subject we quote from Heaven v. Heaven, Mo.App., 363 S.W.2d 33, 39:

"Indignities sufficient to justify the granting of a divorce ordinarily must amount to a continuous course of conduct as distinguished from a single act or occasional acts. In addition, the acts relied upon must amount to a species of mental cruelty, and should demonstrate a course of behavior by one of the parties toward the other whereby the other's condition is rendered intolerable through acts of such character and frequency as to be subversive of the family relationship. Clark v. Clark, supra [Mo.App., 306 S.W. 2d 641]; Coleman v. Coleman, Mo.App., 318 S.W.2d 378, 381. It should also be observed that a party to be entitled to a divorce should be an innocent and injured party but the courts of this state have repeatedly held that a party to a divorce action is not deprived of his status as an innocent party simply because his conduct has not been perfect at all times. To prevent a person from being adjudged an innocent and injured party, his or her behavior and conduct must have been such as to entitle the other spouse to a divorce. Elgin v. Elgin, Mo.App., 301 S.W.2d 869, 872".

Applying those definitions to the evidence in the instant case, how should this appeal be decided? Has the plaintiff husband been subjected over a long period, to such indignities as to make his condition in life intolerable? That is the ultimate question. The cold, printed record substantiates many of the plaintiff's charges. It is quite clear that except for the time he was in prison, plaintiff worked hard and regularly. He had a substantial income. He was respected by his employer, Mr. Miller. All this belies the accusation that he was regularly drunk. He devoted his income to the support of his family. He bought them a home and when they objected to living in Independence, rented a house in Kansas City. He paid all of their necessary bills, bought furniture and an automobile for the use of Mrs. Gicinto and their son. He paid checks to which his son had improperly signed his name. He paid the excessive account at Macy's. It is established that defendant called or visited his employer and demeaned plaintiff to him. She threatened and boasted that she would send him back to prison. There was testimony that she said these things to plaintiff, to his brother and to Mr. Sloan, a fellow employee at the trucking company. This behavior continued over a period of years. She and her 23 year old son locked him out of the house when he was paying all the bills and after doing these things she sought in court not a divorce, but separate maintenance. This is in keeping with plaintiff's charge that she regarded and treated him as just a meal ticket.

■ It is conceded that plaintiff fully supported his family financially. There is no charge that he ever resorted to physical violence against his wife. The only charges of misbehavior against plaintiff are: (1) he was regularly drunk. It is difficult to accept this charge at full face value in view of his regular, productive and satisfactory work record; (2) he associated improperly with other women. We do not know if this is so; (3) he cursed and argued with defendant. It seems likely this is true; (4) he is an ex-convict. This, of course, is true, but this fact should not permanently deprive him of his marital rights, including his right to conjugal respect and consideration.

On some of the charges and counter charges there is a sharp conflict in the testimony. We do and are required to defer to the trial court as to which of these disputed versions shall be accepted. This is done because the trial court had the opportunity to observe the witnesses. The trial judge specifically stated in the record that in his opinion "plaintiff, Charles Gicinto, is the innocent and injured party in this

case; that the allegations of his petition have been supported by the evidence". From a reading of the record we are definitely inclined toward the same conclusion. Certainly we cannot under this evidence and after according due deference as to credibility, rule that the trial court erred in finding for plaintiff. The evidence on behalf of plaintiff, if believed, showed intolerable indignities, which continued for years and indicated hatred, contempt and family estrangement. These indignities were neither single nor occasional acts, but grew into a continuous course of conduct. We believe that Mr. Gicinto was the innocent and injured party and is entitled to a decree of divorce.

The judgment is affirmed.

SPERRY, C., concurs.

PER CURIAM:

The foregoing opinion of MAUGHMER, C., is adopted as the opinion of the Court.

All concur.