Vanda Pearl MISKIMEN, Respondent,

v.

Clifford Ray MISKIMEN, Appellant.

No. 23284.

Kansas City Court of Appeals.

Missouri.

March 6, 1961.

Jack C. Terry, Terry & Welton, Kansas City, D. George Eblen, Belton, for appellant.

Sidney H. Goldsmith, Kansas City, Crouch, Crouch, Spangler & Douglas, Harrisonville, for respondent.

CROSS, Judge.

In this case plaintiff Vanda Pearl Miskimen sues her husband, the defendant Clifford Ray Miskimen, for a divorce on the ground of alleged indignities. Defendant filed a cross petition but dismissed it before trial. He appeals from the trial court's judgment granting plaintiff a divorce and allowing her $300 for attorneys' fees, contending that plaintiff failed to show that she was the innocent and injured party and failed to establish a cause of action.

At the time of trial plaintiff was 77 years old. Defendant's age was 69 years. They were married in 1945, plaintiff then being a widow—defendant a widower. In 1949, they purchased and moved to an 11-acre farm near Belton, Missouri. They lived there until the separation in 1960. No children were born of the marriage. Plaintiff has no living children, but has grandchildren and great grandchildren. Defendant has two married daughters.

Both parties receive social security benefits. They jointly own the Belton farm, two promissory notes and a Dodge automobile. At the time of the separation they had a joint bank account in which plaintiff had deposited her separate funds. She then withdrew less than half the amount on deposit. She also took with her the Dodge automobile, which had been bought for her use. Both parties had contributed to the purchase price of the car.

Plaintiff took care of the house, prepared the meals and took care of defendant's clothing, which she washed and ironed. She helped with the farm work. She has driven the tractor, helped put baled hay in the barn loft, assisted in feeding the cows and hogs, done work in the garden, fed chickens and gathered the eggs, and delivered eggs on the egg route.

In February, 1958, plaintiff suffered the rupture of a blood vessel and bleeding in her left eye. She was examined by Dr. Doane, a physician, who found that the blood vessel rupture was caused by high blood pressure and hypertension with cardiovascular disease verging on a stroke. Plaintiff continued under his observation and treatment after that date. Her condition responded to medication except at times of emotional stress. Dr. Doane testified that plaintiff's high blood pressure was caused by emotional strain, which was dangerous to her life, could cause a stroke, paralysis, or her death. He advised plaintiff it was imperative that she have no emotional upsets whatsoever.

Plaintiff testified that on January 3, 1957, defendant told her to "shut" her "G—— D—— mouth" and struck her on the face. It was a forceful blow, delivered in anger, and caused her face to swell and discolor. It was "kind of yellow the next day". She had headaches after that for a week or more, suffered extreme elevation of her blood pressure and sought medical treatment. She left defendant on January 9th, six days later. She recalled other things defendant had done to her. Once, in 1959, after plaintiff told defendant some of her things were missing, "he jumped out of his chair with his fist and made like he was going to come and strike me, but he stopped

after two steps and he told me to get my things and get out of there * * *." On another occasion defendant threw a dead snake toward her because he knew she was afraid of snakes. Another time he said "he should get a snake and make a tie for me". He would also throw a fishing worm at her or drop it in her hand, although he knew "she was as scared of fishing worms as snakes". He so testified. One time, when they were playing cards, defendant said to his daughter that "he should take an axe and cut the hide to let the light in I was so damn goofy". When plaintiff's sister came to the house defendant wouldn't speak to her and ignored her. At first plaintiff's friends and relatives came to visit her, but they quit coming. One time he took a hammer to bed. That scared plaintiff again, and she asked why he had the hammer, but he never told her. One Saturday afternoon defendant brought a neighbor woman and her grandson to the house and told plaintiff they were going to stay all night. They did so. Next morning, in their presence, defendant ridiculed and found fault with plaintiff. It hurt her and she went into the other room and cried. One night after plaintiff and defendant had gone to bed, defendant's daughter came upstairs, put both hands on plaintiff's neck and said "I could choke you". Defendant said nothing and made no remonstrance. Plaintiff bought a piano with her own money. Whenever she would attempt to play it, defendant would tell her to stop that noise and turn on the television. He would play the television so loud "sometimes you couldn't hear yourself even think". He falsely accused her of taking the two jointly owned promissory notes. When plaintiff was driving the tractor between the years 1949 and 1951 and 1952, she couldn't turn to suit him, defendant called her a "damn fool" and told her she had no sense and said she was "so damn stupid". Plaintiff testified: "I knew I was in danger after he hit me like that and I didn't know what to do". When asked if she were afraid to return to her home at Belton, she stated:

"Oh, land! Yes, sir, after he went after me I wouldn't go again".

Alan Hensler is a grandson of plaintiff and division manager of the A. S. Aloe Company. He testified that he would visit plaintiff, together with his wife and three children (plaintiff's great-grandchildren). He has heard defendant call his grandmother "an idiot and stupid". The last time they were at her home was New Year's of 1957. When Hensler, his wife and children walked in, defendant was sitting on the divan. Hensler said "Hello" but got no response from Mr. Miskimen. "There was no conversation at all took place and my wife received the severest of looks and we turned and left". They never went back after this incident. The children were reluctant to return.

Mrs. Gladys Turpin knew the parties, having lived next door to them for three years. In January, 1960, she saw a bruise and swelling on plaintiff's face and learned that Mr. Miskimen had struck her.

Defendant testified and admitted he struck plaintiff "a good stinging blow with the open hand' but not with his fist. The particular place where he struck her was where he had seen blood shoot out of her eye as the result of the blood vessel rupture in 1957. He stated she had been "complaining about my daughter to me". She had not sworn at him but used some "cuss words" after he hit her. Defendant admitted he never apologized for striking his wife. He denied making any threats of violence to plaintiff on any other occasion. Mr. Miskimen admitted throwing the snake toward plaintiff and frightening her with worms. He knew that plaintiff was suffering from and receiving medical treatment for "high blood pressure and cardiac trouble and one thing and another", from 1957 to 1960. He admitted he knew that condition was aggravated with increased tension. He stated that at first his younger daughter "resented" plaintiff, but that the friction "wore out" as far as his daughter was con-

cerned; that his wife complained frequently about his daughters, and that "it was just a continuous subject for her to be nagging about". Defendant denied having restrained visitors from the house. When defendant was asked if he would say he had a happy and fairly normal married life except for "these complaints about your daughter" he said, "Well, no sir, I couldn't say that it was * * *." Defendant also testified that, in his opinion he and plaintiff could no longer live together in peace and harmony.

Defendant principally argues: (1) plaintiff provoked defendant to strike her; (2) the single act of striking plaintiff does not entitle her to a divorce; (3) plaintiff's evidence is uncorroborated and not sufficient basis for granting her a divorce. After reading the record in this case, we are firmly convinced there is no merit in these contentions.

We have carefully searched the transcript for any shred of evidence tending to show that defendant was under some justifying provocation to strike his wife in the face, as the testimony shows, and as he admits. The blow was brutal and dangerous, delivered upon an elderly woman, a heart patient with fragile arteries, by a man 8 years her junior. It went to a place where, to his admitted knowledge, an artery had ruptured and spurted blood *without any blow* three years before. Under these circumstances that assault was a gross violation of plaintiff's person and personal rights. We find her innocent of any provocation for it.

█ In arguing that plaintiff has shown only a single act of indignity (the striking) and is therefore not entitled to a divorce, defendant cites Hoffman v. Hoffman, Mo. App., 224 S.W.2d 554. That case contains a statement of the general rule applied in divorce actions grounded on indignities. It is to the effect that indignities sufficient to constitute a statutory ground must amount to a species of mental or physical cruelty, and most ordinarily amount to a continuous course of conduct—not a single or occasional act or word. The course of conduct complained of must be such as to connote settled hatred and a plain manifestation of alienation and estrangement. Indignities consist of unwarranted acts or words, by one spouse to the other, manifesting contempt or contumely, or doing physical harm, accompanied with insult, amounting to a species of cruelty to the mind. These principles are appropriate for application to the facts before us.

We do not agree that this is a single indignity case. The evidence shows and we find as fact, that there have been numerous acts on the part of defendant, over a period of years, tending to degrade and humiliate and to cause her mental anguish, to wit: threatening plaintiff with a clenched fist; ordering her to get out; frightening her with snakes and worms, acting uncivilly toward and estranging plaintiff's sister, grandson, great-grandchildren and other relatives and friends; calling plaintiff insulting names such as "idiot" and "damn fool"; telling his daughter he should "take an axe and cut the hide" because plaintiff was "so damn goofy"; ridiculing and finding fault with plaintiff before the woman and her grandson whom he had brought home to spend the night; failing to remonstrate when his daughter put both hands on plaintiff's neck and said "I could choke you"; his boorish conduct when plaintiff tried to play her piano; falsely accusing plaintiff of taking away the promissory notes; telling plaintiff she had no sense and was "so damn stupid" at the very time she was driving a tractor to assist him in his work; calling plaintiff an "idiot" and "stupid" in the presence of her grandson; and indulging in the unexplained behavior of taking a hammer to the bed where plaintiff slept. This is a multiple indignity case.

Defendant says the evidence does not preponderate in plaintiff's favor for the reason that her testimony lacks corroboration except for the assault. In this connection defendant admonishes that it is our duty to review the whole evidence and to give def-

erence to the findings of the trial judge. Our review of the whole evidence (deferring properly to the trial judge) divulges the fact that plaintiff's evidence has corroboration other than defendant's admission that he struck her. Plaintiff is supported by the testimony of Dr. Doane, who attributed her acute condition of hypertension to emotional stresses. The snake and worm incidents are admitted by defendant. Plaintiff is corroborated by her grandson who testified that when he and his family were greeted by defendant with insult and silence they never returned to plaintiff's home, and who related that, in his presence, defendant called plaintiff humiliating names. Further, defendant's failure to deny most of the incidents of indignity tends to affirm their truth.

■ Even if plaintiff's evidence stood alone—uncorroborated—we think it is sufficient for the purposes of her suit. Corroboration is not a *sine qua non* to prove indignities. There is no inflexible rule that a divorce will not be granted upon the uncorroborated testimony of the complaining party. White v. White, Mo.App., 180 S.W. 2d 229. Corroboration merely goes to the weight of the evidence—to the credibility of the party offering it. Divorces have been granted without evidence to corroborate the prevailing party.

It is apparent to us that defendant has treated plaintiff with contempt, disrespect and hatred over a period of years. Clearly, he has no regard of affection for her. We are convinced that it has become impossible for these two people to live together except in disharmony and strife. This court will not impose that condition upon them.

■ Our findings are in accord with those of the trial court. We determine that plaintiff has preponderantly established that she is the innocent and injured party; that she has suffered acts and words from defendant, over a long period of time, indicating a course of conduct amounting to mental cruelty and injury which has rendered her life intolerable.

We believe that plaintiff cannot continue to live as defendant's wife without hazard to her life and health. This view is sustained by defendant's declaration that he and plaintiff can no longer live together in peace and harmony—a statement inducing conjecture upon the reason for defendant's resistance in this suit.

We find no merit in defendant's complaint that the trial court abused its discretion in allowing plaintiff the sum of $300 for attorneys' fees. In view of the evidence, the allowance was reasonable and fully justified.

The judgment is affirmed.

All concur.