Bridget MAYOR, Plaintiff-Respondent,

v.

Paul MAYOR, Defendant-Appellant.

No. 30493.

St. Louis Court of Appeals.

Missouri.

Nov. 21, 1961.

Motion for Rehearing or to Transfer to Supreme Court Denied Dec. 26, 1961.

Dearing, Richeson & Weier, Samuel Richeson, Hillsboro, for defendant-appellant.

Thurman, Nixon & Blackwell, Jeremiah Nixon, Hillsboro, for plaintiff-respondent.

DOERNER, Commissioner.

Plaintiff instituted this action for divorce, alleging indignities on the part of defend-

ant which rendered plaintiff's condition intolerable. Defendant filed an answer and cross-bill. At the conclusion of the trial, the court found that the plaintiff was the innocent and injured party and entered a decree granting plaintiff a divorce, alimony in gross of $7,500, an attorney's fee of $200, and $50 for a real estate appraiser's fee. On appeal defendant disputed both the allowance of alimony and the appraiser's fee, and since the total of those sums exceeded our then monetary jurisdiction the appeal was transferred to the Supreme Court, 340 S.W.2d 142. That court found that the item of the appraiser's fee had not been properly preserved for appellate review, and retransferred the matter to us, 349 S.W.2d 60.

With the ever troublesome question of appellate jurisdiction thus eliminated, the first of defendant's remaining assignments is that plaintiff's evidence was not sufficient to justify the decree of divorce in her favor. This requires a review of the evidence favorable to plaintiff.

Plaintiff and defendant were married on May 31, 1916, and separated on April 26, 1959. Throughout all of their married life they lived on an isolated farm located about five miles southwest of Richwoods, Missouri. In the main, plaintiff's evidence primarily concerned the defendant's refusal or reluctance to provide proper medical care for the plaintiff, or to pay for it when it was obtained. It was shown that plaintiff underwent an hysterectomy at the hands of a specialist in St. Louis in 1943, and that from time to time thereafter she required medical attention. Plaintiff testified that the defendant would never do anything when she asked him to take her to a doctor. According to plaintiff, the specialist's bill for the operation in 1943 was $400, of which the defendant paid but $75, the rest having been paid by two of their daughters. Inferentially, defendant conceded that that was all he had paid, but stated that he didn't think the bill was $400. Defendant testified that he bought the "older girl" a $100 bond for what she had paid, which

she guessed would cover it. Defendant also stated that Lillian, a younger daughter, who was working, had paid part of the bill, " * * * maybe quite a bit * * *," but when repeatedly pressed as to whether he had ever asked Lillian what she had paid he stated that Lillian never mentioned it to him, that she was under age, that he didn't " * * * think it was any more than right that she help her mother," and finally, that the subject was never mentioned.

A prior separation between the parties occurred in 1951, which lasted for a year. According to plaintiff the immediate inducing cause was that she asked defendant for money to get her glasses changed, and the defendant told her to go to hell. Plaintiff further testified that about two years before the final separation her son or son-in-law was about to take her to the doctor for a check-up, and the defendant stated that whoever took plaintiff to the doctor would have to pay the bill. On another occasion, about the same time, trouble arose over a $15 balance on a medical bill, owed for almost a year, originally for $50. When defendant failed to pay it, plaintiff did so by writing a check, and when defendant learned that she had done so he told her that if she ever touched his check book again he would take his rifle and she would never write another check.

The events culminating in the final separation on April 26, 1959, appear to have transpired during the two weeks preceding that date. Plaintiff testified that she had been ailing for about a year, and was suffering from high blood pressure, nervousness, and a bloody discharge. Plaintiff asked her sister to take her to a doctor, and on a Wednesday or Friday the sister took her. On that occasion plaintiff went to a Dr. McKinstry, who advised her that she had high blood pressure and would have to be treated for the blood she was losing. He asked her to come back in two weeks. When plaintiff returned home the defendant didn't ask her how she was. On the following Sunday one of the daugh-

ters came out to the farm with food and prepared dinner. Plaintiff's brother resided with the parties and helped defendant with the work. The daughter told the brother to see that plaintiff got to the doctor. The next day, Monday, plaintiff was in bed and couldn't get up. She testified that she asked defendant to milk the cows, as she couldn't do so, and that the defendant told her she was a burden on his back; and that when she asked him what he was going to do about it, defendant said " * * * 'I will have to get rid of you some way or other.' * * *"

After the defendant had gone to work that day plaintiff's sister came to the farm and took the plaintiff to a Dr. Cresswell, as defendant, according to the plaintiff, didn't like the first doctor. Since the defendant didn't know she was going a note was left for him. Plaintiff was delayed because of the absence of the doctor from his office, and didn't return until 8:00 P.M. She was accompanied by her brother, who informed defendant what the doctor had found wrong with plaintiff, and that plaintiff would need better care. According to plaintiff defendant became angry and " * * * told my brother for the whole God damn bunch of us to get out. * * *" She took the three dresses that she owned and went to her sister's home, half a mile away.

Plaintiff testified that subsequently she moved to the home of a married son and at the time of the trial was assisting him in the operation of his tavern and cafe, for which she receives $20 per week, as well as her room and board. Since the separation her blood pressure has returned to normal, and she is required to go to a doctor only every three months to have it checked.

In addition to the foregoing plaintiff also related other instances in which the defendant had called her a "dirty name," particularly once when the defendant, mad at a cattle buyer, had, in a fit of anger, jerked plaintiff's clean curtains down and stamped on them; and testified that the defendant had nagged at her, and had been cold and indifferent.

Defendant denied or sought to explain away much of plaintiff's testimony, but as has been said many times by our appellate court, great deference should be paid to the findings of the trial court, who had the parties and witnesses before him and was in much better position to judge of their credibility. Doll v. Doll, Mo.App., 327 S.W.2d 501. The plaintiff's evidence showed that she had been ailing and in ill health for years. Defendant admitted that plaintiff didn't "feel good" and that she was not in good health immediately prior to the separation. The evidence shows that throughout all of those years the defendant did not once bestir himself to take plaintiff to a doctor, although requested to do so. Whatever medical attention plaintiff obtained was through the assistance of her children or her relatives, over either the opposition of the defendant or, if with his consent, begrudgingly given. Furthermore, the record shows an extreme reluctance or outright refusal of the defendant to bear the expense of the medical attention given plaintiff, and a disposition to shift to others a financial burden which was his alone. It has been said that each case in which a divorce is sought on the grounds of indignities must necessarily be determined by its own facts, Kinder v. Kinder, Mo.App., 267 S.W.2d 356; Richardson v. Richardson, Mo.App., 270 S.W.2d 68. Broadly speaking, the acts relied on must amount to a species of mental or physical cruelty, and must evidence a course of conduct by one spouse towards the other whereby the other's condition is rendered intolerable through acts of such character and frequency as to be subversive of the family relation. Ames v. Ames, Mo. App., 284 S.W.2d 888; Cadenhead v. Cadenhead, Mo.App., 265 S.W.2d 426. The evidence amply supports the charge that defendant's conduct was of that character and frequency.

Defendant next contends that plaintiff's evidence was not sufficient to sustain

the decree because it was uncorroborated. In some respects, at least, plaintiff was corroborated by defendant's own testimony. Besides, there is no inflexible rule that in a divorce case the testimony of the prevailing party must necessarily be corroborated. White v. White, Mo.App., 312 S.W.2d 167; Sellars v. Sellars, Mo.App., 274 S.W.2d 509.

Defendant also claims that the plaintiff left their home and remained apart from him because defendant refused to sell his farm and buy a smaller and less isolated place. Plaintiff denied that she left defendant for the reason stated, and said that the matter of another place was first discussed after the separation, when defendant told her "* * * you are welcome back to go to work," but that she refused because "* * * I know what it would be, it would be the same thing. * * *"

The final point raised by defendant, that the alimony in gross of $7,500 awarded plaintiff is grossly excessive, is one which has given us considerable concern. Plaintiff contends that the reasonable value of defendant's property amounted to $19,200. The principal item of property going to make up that figure was the farm on which the parties resided. The title was in the name of defendant, and had been assembled by the purchase of three parcels. The first 80 acres was purchased by the defendant from the Missouri Farm Colony Company in 1910 for $10 per acre. The second parcel was purchased by defendant from his father in 1918 for $1,100. At the time the parties were married, in 1916, this tract had a small house on it in which they lived, until defendant built another house thereon in 1947 at a cash outlay of $500, plus his own labor and timber cut from the land. In addition to the frame dwelling there was also a barn and a granary, or combination granary and machine shed on this 80 acres. The third parcel of 120 acres was purchased by defendant in 1937 from a man named Lacey for $1 per acre, but something was realized from a pipe line company for an easement, and defendant's actual payment for this tract was $39.

Plaintiff's expert witness, Paul Politte, a real estate man, inspected the farm at the request of plaintiff's counsel. He was accompanied by one of his salesmen, and by the plaintiff, who pointed out to him the boundaries of the 80 acres with the house and other improvements on them. Politte testified that in his opinion the fair market value of that parcel was $7,600, and that the land alone was worth $30 per acre. He testified on direct examination that he had not paid any attention to the rest of the farm, and that he couldn't say whether the figure of $30 per acre would apply to the adjoining tracts. There was no explanation offered as to why Politte did not inspect and arrive at an opinion as to the rest of the farm, when he knew he was to appear as a witness. Plaintiff testified that in 1951 defendant told her he could get $19,000 "for the whole thing" but defendant testified that that figure was the amount in an option to buy given a mining company at the time it prospected his farm for minerals. Plaintiff conceded that no minerals were found, and did not deny that the figure of $19,000 was made in connection with the option. Defendant's estimate was that the whole farm was worth $6,700, but he declined to put any separate valuation on either of the three tracts. He testified that some three or four years previously he had been offered $700 for some young pine on "70 acres at the back of the place," but declined the offer. Whether such timber was worth more or less at the time of trial was not shown.

In the absence of any direct evidence in her behalf plaintiff argues that the entire farm had a value of $11,900. In part, she bases her contention on the fact that during cross-examination defendant stated that the 120-acre tract was "About the same" quality as the 80 acres which were improved, and which Politte testified were worth $30 per acre. To the supposed figure of $3,600 thus arrived at plaintiff adds the valuation of $7,600 Politte had placed on the 80 acres, and the $700 for the timber, an offer made three or four years previously. Plaintiff's argument, at best, is a tenuous one, and the

figure for the fair market value of the farm is obviously not supported by any evidence having probative value.

Evidence is likewise lacking as to the fair market value of certain items of defendant's personal property. Defendant testified that after the plaintiff returned from their first separation, in 1952, he spent the sum of $2,000 to install electricity and water in the house, to build a road, and for the purchase of a television set, refrigerator, deep freeze, rugs, and " * * * all of the like of that. * * *" No attempt was made to have defendant detail the amount spent for each item, nor is there any evidence in the record of the value at the time of trial of the television set, and other furnishings, after seven years' use. Plaintiff contends in her brief that " * * * The fair inference from this testimony is that at the very minimum $1,000.00 would be a fair value for the furniture that the defendant mentioned." Thus we are not only asked to speculate as to the original cost of the items mentioned, but to also infer that such items, after seven years' use, would have a fair market value of $1,000. Further, plaintiff interprets defendant's testimony to be that his tractor was worth $500 or $600, and that the rest of his farm equipment was worth $1,100 or $1,200. While there is room for doubt, we are inclined to construe his testimony to have been, as does the defendant, that all of the farm equipment, including the tractor, was worth $1,100 or $1,200. Lastly, by the use of certain expectancy tables and present value of a dollar schedule, plaintiff computes the present value of defendant's Social Security income of $84 per month to be worth at least $25,527.21. Her argument, however valid, conveniently overlooks the fact that if the same method of evaluation was applied to her own cash income of $20 per week (besides room and board) the resulting present value would, because of her younger age and greater expectancy, be considerably more than that of defendant's, and would have to be taken into account.

It is evident from the record that both parties to this proceeding labored long and hard to accumulate the property in dispute. Plaintiff is undoubtedly entitled to a fair share thereof, as alimony in gross, if the trial court is disposed to award her alimony in that form. But the same spirit of justice likewise requires that defendant should not be required to pay an excessive amount. If this were a case where the evidence as to the value of such property was conflicting we could reach our own conclusion as to that issue, and, if it differed from the amount set by the trial court, dispose of the case by giving such judgment as we believe the trial court should have given. Rule 83.13, V.A.M.R. But where, as here, there is a lack of probative evidence in the record as to an issue our only alternative is to remand the case for a proper development of the question. Oliver v. Oliver, Mo. App., 325 S.W.2d 33; Niedergerke v. Niedergerke, Mo.App., 271 S.W.2d 204; Erlacher v. Erlacher, Mo.App., 145 S.W.2d 974.

Accordingly, it is the recommendation of the Commissioner that all of the judgment be affirmed except as to the allowance of alimony; that it be reversed as to that part allowing plaintiff alimony in gross of $7,500; and that the cause be remanded for further proceedings as to that issue.

PER CURIAM.

The foregoing opinion by DOERNER, C., is adopted as the opinion of the court.

Accordingly, all of the judgment is affirmed except as to the allowance of alimony; it is reversed as to that part allowing plaintiff alimony in gross of $7,500; and the cause is remanded for further proceedings on that issue.

ANDERSON, P. J., RUDDY, J., and JOHN J. KELLY, Jr., Special Judge, concur.