**Annie Chloe WILSON, Plaintiff-Respondent,**

v.

**Warren W. WILSON, Defendant-Appellant.**

No. 7990.

Springfield Court of Appeals. Missouri.

Feb. 10, 1962.

Lincoln, Haseltine, Keet, Forehand & Springer, Springfield, for appellant.

Tucker & Gleason, Willard S. Tucker, E. Andrew Carr, Springfield, for respondent.

McDOWELL, Judge.

Plaintiff instituted this action for divorce alleging indignities on the part of defendant which rendered her condition intolerable. Defendant filed answer and cross-bill. At the conclusion of the trial the court found plaintiff was the innocent and injured party and entered a decree granting her a divorce, care and custody of the minor child, Jennifer, and dismissed defendant's cross-bill; that plaintiff have and recover from defendant the sum of $100 per month child support, $10,000 alimony in gross and attorneys' fee of $750. From this judgment defendant appealed.

Plaintiff's amended petition alleged the following indignities as grounds for divorce, to-wit:

That defendant became cold, distant and aloof in his attitude toward and treatment of plaintiff.

That defendant continually nagged and berated plaintiff, belittled and ridiculed her, and continually belittled and spoke profanely of plaintiff's sons by a previous marriage.

That defendant, throughout the marriage, has attempted by various and devious manner and means to alienate plaintiff from her children, and that defendant's actions in this respect have been particularly marked and vicious since the birth of their daughter.

That defendant throughout his marriage to plaintiff has subjected plaintiff and her sons, by a previous marriage, to sadistic, harsh, cruel, inhuman, irrational and unreasonable treatment and discipline.

That defendant accused one of plaintiff's sons of an improper act toward their daughter, refused plaintiff the right to question the child about it, wrote a long rambling, incoherent and fictitious account of the alleged offense, forced plaintiff to sign the same with defendant, mailed it to the boy's commanding officer in the Navy in an attempt to have the boy punished by naval authorities; that defendant circulated copies of the account to the boy's aunts, uncles, grandparents and other relatives in an attempt to alienate the child's relatives.

That defendant insisted upon plaintiff accepting a teaching position in the school system of Sparta, and at the same time insisted she sign a written agreement, prepared by him, agreeing to turn over her entire salary to him and that he in turn was to pay her $50 per month; that during the past four years defendant has retained plaintiff's earnings except $50 per month and has forced her to spend that amount for family groceries.

That defendant during his last three years of marriage to plaintiff has refused to provide plaintiff with help in caring for their fourteen room home, although insisting that she teach.

That defendant has improperly associated with another woman.

That defendant has a violent and ungovernable temper, has interfered with her teaching and caused so much trouble in the school that she was unable to renew her contract.

It alleged that one child was born of the marriage, Jennifer Chloe, age 9, September 29, 1950; that she is now in the custody of defendant; that plaintiff is a prop-

er person to have the care and custody of. said child.

That defendant is a practicing physician at Sparta, has substantial real estate holdings and yearly income; that he is able to provide for the support of plaintiff and said minor child and for plaintiff's support pending the termination of this action.

The prayer for relief is that the court grant plaintiff a divorce, custody of minor child, alimony in gross, temporary alimony during the pendency of the suit and attorney fees.

Defendant's answer to plaintiff's first amended petition admits the marriage, as alleged, and the date of separation, but denies all other allegations. It affirmatively pleads a marriage contract entered into between the parties as a defense to plaintiff's right to recover alimony in gross.

Defendant's cross-bill alleged indignities on the part of plaintiff as follows: That she has continually nagged at defendant on account of money matters, falsely accused him of being stingy; stated she did not wish to live with defendant longer, became cold, distant and aloof in her treatment of defendant, failed and refused to cooperate with him in the building of an estate for their later years and insisted upon spending money because the estate would not go to her sons by a previous marriage; that plaintiff insisted on teaching, over defendant's protest, saying she would leave him rather than stop teaching; that plaintiff, over protest of the defendant, incurred bills at various stores which the family could not afford and demonstrated her extravagance and disregard of defendant's efforts to run the home and financial affairs on a sound and economic basis; that plaintiff belittled and ridiculed defendant's attitude toward actions of her son, Bill, with relation to their daughter when such actions were deserving of blame and censure; that plaintiff has interfered with defendant's proper disciplining of their said daughter; that plaintiff without cause left the family home, refused to return upon defendant's request; that plaintiff falsely accused defendant of associating with other women, including patients of the defendant; that she falsely and without reason accused defendant of telling falsehoods with respect to plaintiff's older son; that she nagged and fussed at defendant without just cause, accusing him of not giving her older son more money; that she falsely accused defendant of being sadistic in disciplining plaintiff's two boys and became violently angry when defendant attempted to correct bad habits of the boys; that she falsely accused defendant and their daughter, Jennifer, with falsehoods with respect to immoral conduct of plaintiff's elder son with said daughter; that she falsely accused defendant of being an atheist; that she, on numerous occasions, called defendant profane and degrading names.

The prayer is for decree of divorce, care and custody of Jennifer, their minor child, and such other relief as the court may deem proper.

Plaintiff's reply to the cross-bill amounts to a general denial of the alleged indignities and an affirmative plea that defendant procured her signature to the alleged marriage contract after the vows between plaintiff and defendant had been solemnized; that her signature was procured by duress, fraud, deceit, imposition and overreaching on the part of defendant; that the conditions and terms of said contract are unconscionable upon their face, unfair, unjust, unreasonable and inequitable; that defendant did not act in good faith or fairness and did not present the document when plaintiff had reasonable time or opportunity to study the terms and conditions and reach an intelligent conclusion as to whether or not signing it would be to her best interest; that the document was not supported by consideration, which is inadequate on its face. It pleads that by reason of the above facts the alleged marriage contract is void ab initio and asks that the court declare the same void and of no effect; that since the marriage defendant

has stated many times he did not regard the contract binding; that by subsequent acts and conduct in dealing with the separate property of plaintiff, defendant has rescinded and abandoned the same; that he has accepted some $12,000 money earned by plaintiff teaching.

The record in this case consists of some 400 pages of testimony. We will make a summation of facts therein stated necessary for a determination of the issues involved.

The parties were married August 7, 1949, and separated August 13, 1960. It was plaintiff's second marriage and defendant's seventh. Plaintiff had two sons by her former marriage, Jerry, age 5½ years and Bill, just short of 9. Defendant had two children by a former marriage, John Pitman, age 4, and Deborah, age 12, who were, at that time, in the custody of their mother.

Prior to the marriage both plaintiff and defendant were residents of Sparta. He was an osteopathic physician and surgeon with offices in Sparta, where he had been practicing since 1939. Plaintiff had no property except some household goods and an automobile and she testified defendant told her that he had property of the value of $50,000, and was indebted in the sum of $20,000. She stated this was the only discussion about property matters prior to the marriage; that nothing was ever said about a marriage contract.

Plaintiff's testimony was that she had known defendant for ten years; that he had been their family doctor but their actual courtship was only two or three weeks. At the time of marriage she was 39 and defendant 49. A daughter, Jennifer, was born to the marriage September 29, 1950.

She stated that she and the defendant discussed the matter of her children making their home with them prior to the marriage and that he stated he would not permit anyone to live in his home unless he had charge of their discipline, to which arrangement she agreed. She testified that soon after the marriage defendant took complete control of her children, said she was too lax in their discipline and called her a "doting mother". She stated: "He immediately set about, just,—well, reorganizing our lives, completely."

Plaintiff testified she had no voice in the disciplining of her children; that if she protested it only made him more bitter toward them; that if she tried to correct them he would say she was either too lax or too harsh, she was never right.

Defendant stated the home was his and he would run it as he saw fit; he had been in the military service and she testified that the operation of the home was sort of a military regime, run on military lines; that the boys would have to stand inspection of their bathroom, clothes, etc.; that he would go through their dresser drawers, check to see if the towels were straight on the racks and if they had complied with all other rules he had laid down for the family.

Her evidence was that these minor boys were required to get up at 5:00 or 5:30 in the morning and do chores on the farm; that they were first required to take care of 3,000 chickens and grade the eggs. Later, defendant required the older boy to take charge of a dairy and milk the cows. Defendant had a rule that plaintiff could not call the boys in the morning but they must get up on their own accord and, when they failed to do so, he would go up and use a strap on them. Under his military rules the boys had to have their chores done, their shoes blacked and ready for school by 7:15. Immediately after school they had to change clothes and do their farm chores, sometimes working until dark. On Sundays they had to help defendant in whatever jobs he had laid out. Plaintiff testified the boys were always polite and obedient to defendant but that he used the same military attitude toward them at all times expecting them to do their work exactly without variation. If they violated his rules they were spanked or had privi-

leges of attending school parties, etc., taken from them. She said his conduct toward the boys was a mental harassment.

In regard to allegations in the petition that defendant subjected these boys to cruel, harsh and unusual treatment, plaintiff stated that the boys had nice singing voices, played in the school band; that the older boy was to enter a singing contest and defendant asked him how he was going to go and her son said one of the ladies there, whose daughter was going to accompany him, said she would take him and bring him home in time to do his chores. Defendant said the boy lied to him about the matter and made plaintiff telephone school authorities that he was unable to attend. The boy was a member of the school band and when he could not go it caused a shortage in the band. She testified: "He would just fuss at us at the table. He would always bring up these things at the table, and we would be sitting at the table, eating, and he would sit and just glare, and glare, and glare, at first one boy and the other, until we were almost paralyzed. And then he would start saying that—what that one had done, and what this one had done, and that he had to punish them. And he would say, 'Tell your mother what you did'. And then he would act like it was just a terrible crime, and then he would use a Pi Phi paddle that Deborah had had when she was initiated into sorority, * * *".

Plaintiff's testimony was that defendant required the boys to wear the same shirts, underwear and blue jeans all week; that they hated to wear the same shirts for a week and she hated for them to do so. She stated defendant would not allow them to wear blue jeans to school like the other boys wore but purchased for them big-legged trousers and made them wear them; that Jerry purchased a pair of trousers, and, when he came downstairs, defendant made him take them off and he was never allowed to wear them. She testified she begged defendant to permit the boys to dress like the other boys but he refused. They were required to wash their own clothes in a tub on the outside and were not permitted to use the washing machine and he made them wash their socks every night.

In 1956, plaintiff was employed to teach in the Sparta schools. She testified that for the first two years defendant took her and their daughter to school but would not allow the boys to ride in the car; that he repaired some old bicycles, left on the farm by tenants, made them ride them to school and if they broke down they had to push them. Defendant believed they were breaking the bicycles purposely in order to get to ride in the car. Her evidence was that on one occasion defendant ordered Jerry to wear a cap to school and, when he failed to wear it, he saw him at school, made him go home and get it and gave him a whipping for breaking his rule.

Defendant would not let the boys change their clothes and shoes in the house after they had done their chores at the barn but made them change out in a smokehouse where there was no heat. One of the chores done by the younger boy was mowing the yard. The mower often broke down or parts would come off and defendant thought he was breaking it purposely and punished him. He said he was punishing him on general principles.

Plaintiff's testimony was that when they were first married defendant did take some notice of the younger boy, Jerry, and played some with him but he never had anything to do with the older one. This evidence is corroborated by defendant's testimony. Defendant said Bill was a thief and a confirmed liar; that he never could believe anything he said. Defendant had a rule that the boys could never play with their sister nor enter her room and he testified they were not allowed to come in the room where he and his wife slept. He nicknamed the boys, calling Bill "Pitchfork Pete" because he used his fork like a pitchfork, and Jerry, "Scoopshovel Sam" because he used his spoon like it was a scoopshovel.

As to defendant's violent temper, plaintiff's evidence was that they spent meal after meal listening to a long tirade of what the boys had done or hadn't done and that plaintiff was a doting mother; that she was either too indulgent or too strict; that he would pound on the table until the dishes would dance across it. She testified the boys were not allowed to look at television except on weekends and that defendant had threatened to take a ball bat and knock their brains out if they did not do what he wanted; that he got mad if she tried to stand up for the boys and would stand with his face right up against hers, tap her on the chest, take his fist and hold it up against her, push her head back and say he would like to hit her and things like that; that he cursed and used profanity toward both her and the boys.

Plaintiff testified that she and defendant had many disagreements over his attitude toward the boys; that when she objected to his treatment he would tell her the boys were going to end up in a reform school or that he was going to send them to their father; that the home was his and he would do as he chose.

On an occasion in 1958, plaintiff testified that defendant gave her a written communication (in evidence as plaintiff's exhibit 1). In this statement he said that if she didn't like the way he was disciplining the boys she could send them away. This argument was over Jerry as Bill at the time was in the Navy. Plaintiff's evidence is that defendant's attitude toward her sons was more pronounced after the birth of their daughter; that when he punished the boys he would make them take down their trousers and used a strap or surcingle on them. He feared the Humane Society might do something about his punishment so when he whipped them he required them to count.

Her testimony is that defendant refused to give the boys an allowance but would give them money at times when they needed it. She said he always required them to account for how they spent it.

It seems the most serious disagreement, according to plaintiff's testimony, was in relation to an affair between Bill and his half-sister, Jennifer. Plaintiff testified that defendant stated to her that the older boy had assaulted Jennifer, who was at the time eight years old. When defendant told plaintiff about the matter the boy was in the Navy and she was just finishing a course of study in Southwest Missouri State College. She stated that about a week before the school term was over she and the defendant had been out one night to eat, when they returned home defendant sent Jennifer to bed and he told her that Bill had attacked their daughter; that he did not know just when it happened; that Jennifer was very vague about it. Defendant said he tried to question her but she did not know whether it was Bill or not. Plaintiff said from what defendant had told her she had the impression that the boy had done the worst and she was grief stricken. She admitted writing defendant a note saying if Bill had done such a thing it would have been better he had never been born. Plaintiff testified that defendant refused to allow her to talk to Jennifer about what happened; that she asked him if he was going to cause trouble about this affair since Bill had gone to the Navy and he said he did not mean to do anything to cause trouble but he was going to write Bill and tell him never to come home again. Plaintiff testified she offered to write the letter, and did write one, which made defendant very angry because it wasn't hard enough. She said that after she had her examinations in college defendant told her he was going to write to Bill's commanding officer and send a copy of the letter to all of his aunts, uncles and grandparents to let them know all about it and she would have to sign it. Plaintiff testified she refused to sign the letter because she could not see that it would benefit anyone; that she told defendant Jennifer would have to testify if there was a trial and that he told her he would make her prefer charges against the boy. She stated she told him before she signed it she wanted to talk to

a lawyer; that he stated she had to sign the letter or he would prefer charges himself; that she told defendant she did not believe anyone who knew Bill would believe the story and he said he did not care whether they believed it or not but every time they heard his name they would think of it. Plaintiff testified that because of defendant's threats she went to his office and signed the letter; that while there she realized for the first time the boy had not assaulted the girl, as defendant had stated, but had exposed himself to her. She testified defendant sent the letter to the commanding officer and a copy to the boy's relatives and showed a copy to the sheriff. These facts are not disputed by defendant.

The record is replete with evidence of both plaintiff and defendant that long after the incident in which Bill was accused of exposing himself, defendant used the incident as an excuse to write these letters. We think the trial court would have been justified in finding that the defendant's acts as to the affair revealed that he was not only trying to hurt the boy but as an excuse to hurt and humiliate plaintiff. The inferences are clearly deducible from the evidence that defendant was blaming plaintiff for the whole affair.

Plaintiff's evidence shows that a vacancy in the Sparta schools occurred in 1956; that she talked to defendant about applying for the position and he took her to see the superintendent about the matter and was instrumental in her securing the position; that on Sunday night, before school opened the following day, defendant demanded she sign a written agreement to turn her salary over to him; that they argued about the matter until 2:00 o'clock in the morning; that he stated "We're going to have an understanding about this money"; that just because she earned it did not mean she could do with it whatever she wanted to. She testified defendant finally wrote out the document and she signed it because he said he would not permit her to go to school the next day unless she signed it. It provided, in part, that plaintiff turn over her school checks to defendant and he would deposit in the bank in her name $50 per month. This agreement is in evidence as plaintiff's exhibit 2. She testified she was receiving $25 monthly payments from her former husband as support money for her sons; that up until this time she had been allowed to use this money but that after the agreement she turned this money over with her school checks to defendant; that her salary was something over $300 per month during the four years which amounted to something like $12,000. She stated most of the $50 per month was used in buying groceries for the family.

Her evidence was that defendant allowed her to have charge accounts at some of the stores in Springfield but he would get her cancelled checks from the bank and check each item prior to her receiving them; that she never had any cash on hand.

Her evidence was that at the end of the school year in 1960 she was informed by the school board that she would not be reemployed because of defendant's controversies with the superintendent of school and the school board.

Defendant does not deny his controversies with school authorities. He helped circulate petitions to have the actions of the school board investigated.

As to the pre-nuptial contract, which defendant pleads as a defense, plaintiff testified that after the wedding ceremony was pronounced, she and her husband went out to the car to go on their honeymoon, and, while wedding guests were still standing around, he took from the glove compartment the contract and asked her to sign it. She said she looked through the contract; that he told her he had consulted an attorney and was advised because of previous marriage difficulties, he should have her sign it. She testified she had never seen the instrument before, but, because she did not want to create a scene before the guests, she signed it; that defendant took it over and delivered it to a Notary Public; that

she never acknowledged the same and defendant had not signed it at that time. She testified that after the marriage defendant said the contract was no good when Jennifer was born. He asked plaintiff to sign her name as "Simpson" the name she bore before marriage. The contract provided that in case plaintiff survive defendant her interest in his estate would be limited to one-third in his real and personal property; that in the event the marriage relations were terminated, other than by death, plaintiff was to receive $50 per month for the time she lived with defendant in full satisfaction of her rights against his estate and that in no event the sum received should exceed $5,000. This instrument is in evidence as defendant's exhibit "F". It was notarized by Harry L. Jenkins, August 6, 1949. At the time plaintiff signed it she had no property of her own and defendant was possibly worth between $100,000 and $150,000. There was no discussion between the parties relative to such a property settlement and plaintiff was given no time to examine or determine just what the effect of signing the instrument was.

Defendant's answer alleged that plaintiff wrongfully accused him of associating with other women. In regard to this allegation plaintiff testified that at the time of the marriage defendant told her that one, Mrs. Workman, was in love with him; that after the marriage this woman made frequent visits to his office and consulted with him with the doors locked; that on one such visit she left her little girl out in the office with plaintiff; that she stayed much longer than patients usually did and when she came out she looked embarrassed, hurried around the door and down the steps and the little girl had to run after her. Plaintiff testified that later defendant rented a part of his building, adjoining his office, to her for a beauty salon; that she talked to the defendant about the matter and he told her he would do with his property as he pleased; that he talked his business and family affairs over with this woman and

when he went on calls would leave word with her when he was to return; that the people in the community talked to her about their relationship. Defendant offered in evidence a book account of the doctor bills wherein he had treated the Workman family, which amounted to a considerable amount. He testified that he often went down to her beauty shop and treated patients who were unable to come to his office. It was plaintiff's testimony that Mrs. Workman had told her of conversations she had had with defendant relative to his business and family affairs.

Plaintiff's evidence was to the effect that defendant's attitude toward the boys and herself continued through the entire married life and was progressively worse toward the end; that the final break was due to defendant's conduct relative to some hoodlums or young men who came up to their home about midnight and drove into the driveway. She said she was sleeping in an upstairs bedroom with the window up and her head right in the window; that defendant was sleeping in an adjoining room; that she heard loud talking and their dog ran out and was barking; that she heard defendant say something to the dog and she heard him yelp as if being run over. She testified she asked defendant what they were saying or doing and he said nothing; that the next morning at breakfast she again asked him what happened and he still did not answer; that he finally said "As far as I know, your own sons were out there with those hoodlums, that last night; Your sons were out with those hoodlums". She testified she asked him what he meant because at that time her older son was in the Navy and the other one was with his father in California and he said, "Well, I just mean what I said, * * * You heard what they shouted". She told him she had not heard and he said that they said "Anna Chloe, come out. We want to". Plaintiff said she did not understand what four letter word he said they used; that it meant they wanted to have intercourse with her; that she told defendant

she did not believe that; that if they had called her name she would have heard them but he kept insisting they had. She testified she felt that anyone who would hate her so much as to make those statements, there wasn't any use for her to stay with him; that she packed her clothes and when defendant came back at noon and took up right where he left off she could not take any more.

Defendant refused to let plaintiff take their daughter, Jennifer. He allowed her to pack one suitcase, took her to the bus station to go to her mother's. She testified that he had said before this if anyone ever undertook to take Jennifer from him he would kill them.

She testified she and the defendant, before she left, went to see his attorney, Mr. Keet; that defendant tried to pass off the trouble as a little flareup; that she told the attorney this conduct had been going on for eleven years and there wasn't any hope of them ever getting along the way he was.

Plaintiff denied that she refused to cooperate with defendant in building his estate or insisted on spending his money because the estate would not go to her sons. She detailed how, during their married life, she had canned foods and filled the freezer with foods; that she made almost all her clothing and that of their daughter; that she sewed for the boys, the doctor and his children. She testified she was not wasteful.

She offered evidence as to her good reputation for morality. She stated her younger son had, prior to their separation, tried to get her to leave the defendant but she still tried to make her married life go. She said that while she was visiting her mother in Portageville, before the separation, Jerry ran away; that he called her and she consented that he go with his father to California; that he is now living with her and she is teaching school at Chadwick. She testified that in the latter part of her married life, defendant refused to allow her to employ help in the home, a fourteen room

house; that he had been making the boys do housework and help with the washing and ironing.

As to defendant's property the evidence shows that he owns farms, city property and had bank accounts in the value of between $100,000, and $150,000. We will not set out all of the testimony relative to his property because we think there really is no issue as to this. His earnings amounted to some $14,000.00 annually.

Plaintiff testified that the daughter was still in the custody of defendant; that she was being cared for either by a housekeeper or defendant's uncle who is 80 years of age. Defendant testified that the girl was always with someone or with him. Regardless of which party is granted custody the child will remain in the Elfindale School.

In our opinion we will designate the parties as they appeared in the lower court, appellant as defendant and respondent as plaintiff.

It is the duty of this court to review the record de novo, make its own findings of fact and own conclusions. However, should irreconcilable conflict appear in the testimony we will defer in a large measure to the findings of the trial court who had advantage of seeing the witnesses and observing their manner of answering questions. Greenbury v. Greenbury, Mo.App., 223 S.W.2d 153; Cavaness v. Cavaness, Mo. App., 348 S.W.2d 572, 575[4]; Mayor v. Mayor, Mo.App., 351 S.W.2d 810, 813[1–4]; Doll v. Doll, Mo.App., 327 S.W.2d 501, 504 [1].

The primary question involved on this appeal is contained in point II of defendant's assignments of error wherein he claims the trial court erred in finding plaintiff the innocent and injured party; that plaintiff did not sustain the burden of proof that defendant committed indignities which rendered her condition intolerable.

Under Section 452.010 RSMo 1959, V. A.M.S., it is provided: "* * * or shall

offer such indignities to the other as shall render his or her condition intolerable; * * *."

■ The law is that each case in which a divorce is sought on the ground of indignities must necessarily be determined by its own facts. Mayor v. Mayor, Mo.App., 351 S.W.2d 810, 813[1–4]; Kinder v. Kinder, Mo.App., 267 S.W.2d 356; Richardson v. Richardson, Mo.App., 270 S.W.2d 68.

In Mayor v. Mayor, supra, 351 S.W.2d page 813, the court stated:

" * * * Broadly speaking, the acts relied on must amount to a species of mental or physical cruelty, and must evidence a course of conduct by one spouse towards the other whereby the other's condition is rendered intolerable through acts of such character and frequency as to be subversive of the family relation. Ames v. Ames, Mo. App., 284 S.W.2d 888; * * *". Cadenhead v. Cadenhead, Mo.App., 265 S.W.2d 426; Miskimen v. Miskimen, Mo.App., 344 S.W.2d 289, 292[1]; Moore v. Moore, Mo. App., 337 S.W.2d 781, 786[2–8]; Elliston v. Elliston, Mo.App., 215 S.W.2d 63.

The authorities cited by defendant are in accord with the law as above set out.

■ In contested, as well as uncontested divorce actions, a party seeking a divorce has the burden of showing himself or herself to be the innocent and injured party. Section 452.020 RSMo 1959, V.A.M.S.; Langshaw v. Langshaw, Mo.App., 331 S.W. 2d 15, 18[2].

■ Applying the general rule set out in the authorities herein stated we find there was a settled and continuous course of conduct on the part of defendant toward his wife and her sons which indicated hatred, contempt or estrangement, and that plaintiff suffered much pain and humiliation because of defendant's conduct. The incidents which produced this condition, as shown by the record, are scattered throughout the entire period of the parties' married life. This long record is one unbroken story of contradictions, one side offering one version of the happenings and the other side offering evidence to the contrary. In such case we should, and will, defer to the findings of the trial judge who saw and heard the witnesses. Schneider v. Schneider, Mo.App., 293 S.W.2d 157, 163; White v. White, Mo.App., 312 S.W.2d 167, 169 [1].

If plaintiff's testimony is to be accepted as true, she is the innocent and injured party. It is unnecessary to restate the many indignities offered by defendant to plaintiff, as shown by the record testimony. The evidence shows that defendant was a Czar in the home. He treated his wife and her boys as servants. He continually fussed and argued over trivial matters, cursed and threatened both plaintiff and the boys. He even said he would use a baseball bat on the boys and knock their brains out. Plaintiff testified he would stand with his face right up in her face, tap her on the chest with his fingers and tell her what he would like to do. We think the evidence shows that defendant used an affair between his stepson, Bill, and their daughter, Jennifer, as a means of punishing and humiliating his wife by writing letters, not only to Bill's commanding officer in the Navy, but to the relatives of plaintiff.

Defendant testified:

"Q. Have most of your differences with Mrs. Wilson been mere wranglings, or have they actually been serious, or—? A. Oh, it appeared that they were serious, lots of times, yes, and it usually had to do with the boys."

Defendant admitted that he continually raised fusses with plaintiff and the boys at the table and did not deny her testimony that he pounded on the table with his fists. He merely said that was about the only time he had to meet the family. The testimony further shows that if plaintiff objected to defendant's harsh discipline of her boys he would threaten to have her send

them away. She was not even allowed to leave the home without his consent.

In 1956 plaintiff obtained a position in the schools at Sparta. On the night before school started defendant insisted she turn over her salary to him and he said it was because he thought she might want to spend more money for herself or her children. Her evidence was that he argued with her until 2:00 o'clock in the morning and told her that unless she signed the written agreement he had prepared, turning over her salary to him, she would not be allowed to attend school the next day. Defendant admitted he told plaintiff if she ever tried to take Jennifer away from him he would kill her. He admitted that shortly after the marriage he developed gonorrhea and because of that condition became cold and indifferent toward plaintiff. While he accused plaintiff of giving him the disease, his evidence plainly shows that such was not the truth. His evidence was further that he had no marital relations with plaintiff after 1956. She testified that his quarreling and abuse of her and the boys grew continually worse until the separation. Plaintiff stated that at the time of the separation she could not live with a man who showed so much hatred toward her. The evidence is undisputed that defendant, from the very beginning, would have nothing to do with plaintiff's older son, called him "Pitchfork Pete" and said he was a confirmed liar. Plaintiff's evidence further was that because of the defendant's conduct in disputes with the superintendent of the school and his fussing with the school board, the board refused to rehire her. Defendant admitted circulating a petition to have the school board investigated. All of this conduct was very humiliating to plaintiff and defendant admitted his trouble with the school board created many enemies for him.

Later, plaintiff secured a position to teach in the Chadwick School District and defendant, again, interfered with her work by demanding that she insist the board pay her on a basis of nine months rather than twelve.

Defendant's allegations in his cross-bill alleging indignities on the part of plaintiff are wholly unsupported by the evidence. If plaintiff's testimony is to be taken as true, there is no basis for the charges in his cross-bill. Defendant's evidence fails to support most of the alleged indignities. For instance, he admits he assisted plaintiff in securing the position to teach; that plaintiff turned over her salary to him, which he used to defray his expenses and to create his estate. There was no evidence that plaintiff ever stated she would leave defendant if he refused to permit her to teach. He failed to show any evidence of her extravagance but admits trouble over the discipline of plaintiff's children was serious and the trial court was justified in finding that these troubles were the direct result of the wrongful conduct of defendant.

■ Defendant alleged that plaintiff wrongfully accused him of associating with other women. The evidence supports plaintiff's testimony that defendant told her that Mrs. Workman was in love with him just after their marriage and his conduct in associating with this woman, as set out in our statement of facts, justified plaintiff's suspicion. The mere fact that the people in the community publicly discussed such relations, some of them in the presence of plaintiff, refutes defendant's contention that such accusation on the part of plaintiff was an indignity.

There certainly was nothing in defendant's contention that plaintiff left his home without just cause. The record fully justifies her actions. The record is replete with evidence that the trial court was justified in granting plaintiff a divorce and finding her the injured and innocent party; that he was also justified in finding against defendant on his cross-bill.

Under point I, defendant alleges that plaintiff nagged at him about numerous matters, including his civil work, money and treatment of her boys.

It is unnecessary to discuss this alleged error, having fully gone into the matter under allegation No. II.

Under point III error is assigned to the action of the trial court in awarding custody of the parties' daughter to plaintiff for the reason that it was not in the best interest of the child.

Defendant cites no authority under this alleged error. The law is well settled that in passing upon the custody of a minor child the primary question involved is the best interest of the child.

In Tootle v. Tootle, Mo.App., 329 S.W. 2d 218, 223 [6–9] the law is stated:

"There is no absolute rule by which it can be determined which of the two contesting parents is entitled to the custody of a child upon their separation, but each case must be judged on its own facts 'and in determining where the custody of a child shall go, the acts and attitude of the parents toward each other, the causes leading to the divorce, their treatment of each other, and similar matters, are all material and admissible in evidence as bearing upon the question of the fitness of the respective parents to have the custody of their child.' * * *"

The law is well settled that " 'all things being equal', a child of tender years should be given into the custody of the mother." Keith v. Keith, Mo.App., 95 S. W.2d 669, 672; Tootle v. Tootle, supra, 329 S.W.2d page 224. The guiding star which the courts must follow in determining the question of custody is the welfare and best interest of the child.

The findings of the trial court involving the custody of a minor child are not binding upon an appellate court, which must review the record for itself, but such findings will not lightly be disturbed, and will be deferred to unless the court is firmly convinced that the welfare of the child requires some other disposition. Lutker v. Lutker, Mo.App., 230 S.W.2d 177, 179.

In the instant case the evidence establishes that both the mother and father have great affection for the child who is now eleven years of age. Under such circumstances we think that this court should, and will, defer to the judgment of the trial court.

Under point V, error is alleged as to the action of the court in allowing plaintiff gross alimony in the sum of $10,000. Two reasons are assigned; first, that plaintiff is not entitled to a divorce and, secondly, as to the court's action in setting aside the antenuptial contract on the ground of duress; that if there were duress the contract was only voidable and plaintiff by her unreasonable delay or acquiescence, has ratified it.

To support this contention defendant cites Deibel v. Jefferson Bank, 200 Mo.App. 541, 207 S.W. 869. This case holds that a contract procured by duress is not void, but voidable only; and, if a party elects to repudiate it, he must do so within a reasonable time after the duress has been removed.

Koenig v. Koenig, Mo.App., 191 S.W.2d 269, cited, lays down the same rule of law as in the Deibel case.

Mathis v. Crane, 360 Mo. 631, 230 S.W.2d 707 is cited by defendant. This is an opinion by the Supreme Court and we think lays down the proper rule governing a decision of the issue raised under this alleged error.

The validity of an antenuptial contract was the issue in that case. In some respects the facts are similar to the case at bar.

The action was based on the theory that plaintiff did not understand the legal effect of the contract; that she was overreached by the defendant; that the consideration was grossly inadequate; that defendant led plaintiff to believe he was a man of small means and did not make a full disclosure of his property. The court stated that for the purpose of the case it would be assumed

that plaintiff was well versed in business matters. However, it was conceded that the defendant did not make full disclosure of his property but took the position that plaintiff assumed the attitude of not being concerned about the amount of the property. The evidence was that Mathis told his prospective wife he was worth $40,000.00; that he actually was worth more than $200,000.00. Plaintiff was defendant's private secretary, took care of the household duties and her husband when ill. She took care of much of the details of her husband's business; that while working for him she learned more about his property and she testified that at the time of the agreement she trusted the defendant. This law was stated on page 712 [3–5] by the court:

"Appellant in the brief says that marriage settlements are not against public policy but are favored by the law and the courts, citing 41 C.J.S., Husband and Wife, § 76, page 552. That statement is correct but we also note that in § 75, on the same page, it is stated, 'Marriage settlements ordinarily are intended for maintenance and support, and particularly to guard the wife against the changes of fortune likely to occur in the husband's affairs.' One of the principal elements to the validity of an antenuptial contract is that the prospective husband must be fair and make a full disclosure of the extent of his property. 41 C.J.S. Husband and Wife § 80, page 554; 26 Am.Jur. 894, Sec. 289; Jones v. McGonigle, 327 Mo. 457, 37 S.W.2d 892, loc. cit. 894(1–4), 74 A.L.R. 550; Donaldson v. Donaldson, 249 Mo. 228, 155 S.W. 791, loc. cit. 797(10). In this case Mathis did not make a full disclosure of his property. Not only did he fail to make full disclosure to his prospective wife but he failed to make such disclosure to the court at the hearing for temporary maintenance. * * *

"We may also consider the provisions of the contract, particularly the benefits to be received thereunder by the parties, in determining whether the contract should be set aside. 26 Am.Jur. 895, Sec. 290; 41

C.J.S., Husband and Wife, § 97, page 567, and cases cited under note 98, p. 568."

The court, likewise, held in this case that appellant's contention that plaintiff was exposed to facts which she should have discovered and made accurate estimate of Mathis' property could not be sustained.

In 41 C.J.S. Husband and Wife § 80, page 554, it is stated:

"An antenuptial contract is valid and will be upheld when, and only when, it is entered into freely, fairly, knowingly, understandingly, and in good faith by parties legally competent to contract, the consideration therefor is sufficient, * * * it is free from fraud, deceit, imposition, or overreaching, is not unconscionable, * * * and its provisions are fair, just, reasonable, and equitable. The validity of the contract depends on the circumstances of the particular case, * * *".

It is defendant's contention that the trial court rejected the defense of the antenuptial contract on the ground that defendant used duress in securing it.

In 17 C.J.S. Contracts § 168, page 525, the law is stated:

"'Duress' may be defined as subjecting a person to a pressure which overcomes his will and coerces him to comply with demands to which he would not yield if acting as a free agent, or as the condition of mind produced by an improper external pressure destroying free agency so as to cause the victim to act or contract without use of his own volition."

Defendant admits, in the instant case, that he had this so-called antenuptial contract prepared by his attorney some two or three days prior to the marriage; that he put it in the glove compartment of his car and sometime the day before, he does not remember the exact time, while he and plaintiff were in the car, had her sign the original and two copies. He stated he told her he hated to ask her to sign it but, be-

cause of troubles with former wives, his attorney had advised him to have it done. He does not contend that he fully discussed the terms of the contract with plaintiff; that she had ample time to read and note its contents or that it was fair and equitable. It must be remembered the parties were at that time engaged to be married and there existed between them a confidential relationship which required the utmost good faith and a high degree of fairness. 41 C.J.S. Husband and Wife § 80, page 554. Defendant does not remember whether he signed the contract when plaintiff did or when it was delivered to the notary public, whose acknowledgment appears on the same, but he does state that plaintiff did not appear before the notary for the purpose of acknowledging the instrument. We are of the opinion that this evidence, considered with plaintiff's testimony that the alleged contract was not signed until after the marriage and without her having been given the opportunity to examine the same or to understand its contents, the trial court was justified in finding the contract unenforceable because of duress.

However, under the law, Section 512.160 RSMo 1959, V.A.M.S., it is provided that the appellate court shall examine the transcript on appeal, award a new trial or partial new trial, reverse or affirm the judgment or order of the trial court, or give such judgment as such trial court ought to have given, as to the appellate court shall seem agreeable to law.

Under this provision of the law we find that the judgment of the trial court in setting aside this antenuptial contract was proper for the reason that it was not entered into freely, fairly, knowingly, understandingly, and in good faith. Defendant was not fair in that he did not make a full disclosure of the extent of his property.

We think plaintiff's evidence, if believed, clearly shows she did not understand the legal effect of the contract when it was executed; she was overreached by the defendant and the consideration was grossly inadequate and in reaching our conclusion we have followed the law as declared in Mathis v. Crane, 360 Mo. 631, 230 S.W.2d 707.

We also find against defendant in his contention that by plaintiff's unreasonable delay or acquiescence, she ratified it.

The evidence is that during the married life, and after the birth of their daughter, defendant led plaintiff to believe that the contract was no longer valid and the further fact that she contributed to the defendant's estate some $12,000.00 in itself is a denial of this contention on the part of defendant.

The judgment is affirmed.

RUARK, P. J., concurs.

STONE, J., concurs in result.